**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| D.D.T., by and through his natural parents and guardians, S.C. and D.T., <br><br> Plaintiffs, <br><br> v. <br><br> ROCKDALE COUNTY SCHOOL DISTRICT, *et al.*, <br><br> Defendants. | Civil Action No.: 1:20-cv-04666-VMC |

**PLAINTIFFS' DAUBERT MOTION TO EXCLUDE OR LIMIT
THE TESTIMONY OF DEFENSE EXPERT DR. C. BAKER WRIGHT AND
MEMORANDUM OF LAW IN SUPPORT THEREOF**

COME NOW Plaintiffs D.D.T., by and through his natural parents and guardians, S.C. and D.T., (collectively "Plaintiffs"), by and through the undersigned counsel, and hereby move the Court to exclude or limit the proffered expert testimony of Dr. C. Baker Wright, showing the Court as follows:

## I.    INTRODUCTION

In September 2018, D.D.T., a 13-year-old, non-verbal boy with severe Autism Spectrum Disorder ("ASD"), entered the 6th grade at General Ray Davis Middle School for the 2018-2019 academic year. He was placed in Defendant Dona Pollard's ("Pollard") classroom along with four other severely disabled, non-verbal

1

students. Defendant David Lesesne ("Lesesne") was the paraprofessional assigned to the classroom. Some weeks after the school year began, K.W. was also placed in the classroom as a paraprofessional.

After D.D.T. entered Pollard's classroom, his mother began noticing significant regressive behavioral, emotional, and physical changes that included wetting his pants, increased anxiety, increased aggression, depressive symptoms, school refusal behaviors, and significant weight loss (approximately 24 pounds over the course of the first semester of the 2018-2019 school year). He was diagnosed with anxiety, PTSD, and prescribed Zoloft. He began experiencing tremors and seizures. All of this is documented in D.D.T.'s medical records.

In December 2018, K.W. approached D.D.T.'s mother outside of school and showed her a video of the classroom with D.D.T. on the ground whimpering, and Lesesne holding him down with his foot while brandishing a sticklike object. According to K.W., this type of incident was not unusual.

In fact, during the prior few months, Lesesne and Pollard had been consistently subjecting D.D.T. to emotional, verbal and physical abuse. They called him names and subjected him to other abusive language. They splashed him with water, snapped rubber bands on his wrist, and threatened him with flyswatters and other objects to force compliance with classroom directives. Pollard stomped on

2

D.D.T.'s foot repeatedly, on one occasion so hard that it caused him to begin limping.

K.W. made complaints about the abuse to her colleagues and superiors, including principal Randy Goerner ("Goerner"). Those complaints were ignored.

After the video emerged, the incident was reported to the Georgia Department of Family and Child Services ("DFCS") and the Rockdale County Sherriff's Office, both of which opened investigations. When the second semester of the 2018-2019 school year began, Pollard and Lesesne were assigned to different classrooms. Thereafter, D.D.T. began regaining weight and his behavior began to gradually improve—although he was ultimately withdrawn from the Rockdale County School District. Suit was filed on November 16, 2020.

On August 29, 2022, Plaintiffs disclosed their expert, Dr. Michael M. Mueller, a behavioral analyst at the Ph.D. level with significant expertise in the education of children with significant disabilities and behavior assessment and modification. Dr. Mueller opined that the symptoms exhibited by D.D.T. after joining Pollard's classroom,

> "[a]nd the correlation of their timing match perfectly with the widely held list of negative symptoms that are known to follow trauma and abuse of similar non-verbal disabled students, both as reported in the medical literature and as observed in my own practice. The social withdrawal such as fleeing from unknown people, accidents, decrease in functional skills at home, anxiety and depressive symptoms

identified by his psychiatrist, and his increased aggressive behaviors have resulted from the pattern of systemic abuse at the hands of his teaching staff.  In sum, it is my opinion that the physical, emotional, and verbal abuse that D.D.T. endured caused the behavioral, emotional, and physical changes discussed above."

(Doc. No. 76-1, p. 10.)

On October 13, 2022, Defendants identified Dr. C. Baker Wright to rebut Dr. Mueller's opinions. (Expert Report of Dr. C. Baker Wright ("Wright Report"), attached hereto as Exhibit "A.")  Dr. Wright opines that the abuse D.D.T. suffered *is* a possible cause of the injuries alleged. In fact, Dr. Wright affirmatively opines that "[i]*f abuse occurred, then that would also be a likely -- or a possible factor.*" But he also identifies other "possible" causes, such as D.D.T.'s history and the fact that D.D.T. is autistic. In sum, Dr. Wright opines that the abuse "possibly" caused or contributed to the injuries just as other variables, together or in combination with each other and the abuse, might "possibly" have caused or contributed to the injuries. He just cannot say.

Dr. Wright's opinion, of course, is no opinion at all. He does not (and cannot) rule out the abuse as a cause or contributing cause of the injuries, nor can he (or does he) affirmatively assert any actual causes or contributing causes to the injuries. Rather, Dr. Wright merely points out a number of speculative possibilities that might have (or not) altered the outcome in this case. These equivocal possibilities do not

assist the trier of fact. An "opinion" that it is "impossible to opine" and merely speculates different scenarios that may or may not exist is not reliable, not admissible and, critically, does not assist the jury. Dr. Wright's purported "causation" opinions must, therefore, be excluded.

## II.    FACTS

### a.  Dr. Wright's Causation Opinions: Linking Injuries to the Abuse.

Dr. Wright was hired to provide an expert opinion on D.D.T.'s "behavior changes and the potential effects of any alleged abuse." (Deposition of C. Baker Wright, Ph.D., BCBA-D ("Wright Dep."), attached hereto in relevant part as Exhibit "B," p. 14:16-21.)[1]

He offers eight opinions – the first six of which relate generally to causation of D.D.T.'s injuries ("causation opinions") and the latter two of which relate to Dr. Mueller's opinions. (Wright Dep., pp. 68:18-25, 69:20-70:6; Exhibit A, pp. 3-5.)

With regard to causation, Dr. Wright offers no opinions on how the alleged abuse affected D.D.T. (Wright Dep., p. 16:10-13.)[2] That is, he does not offer any

---

[1] These changes ("injuries") include: weight loss, changes in eating patterns, aggression, regressive behavior in terms of wetting at home and toileting, fear of going to school, fear of getting on the bus, and crying. (Wright Dep., p. 72:6-24.)

[2] Dr. Wright does not have any opinion as to whether the alleged abuse was even traumatic for D.D.T. (Wright Dep., pp. 132:10-133:4.)

opinions on any actual causes of the injuries alleged, or opine on whether the injuries resulted from trauma or abuse. (*Id.*, p. 20:2-16.)[3] Instead, he says he was hired to look at a list of variables to determine what might have possibly caused or contributed to the changes witnessed in D.D.T. during the relevant period. (Wright Dep., pp. 17:17-24, 20:2-16.) But he is unable to do even that.[4]

---

[3] Nor can he. He has never engaged in any course of study specific to abuse against children with ASD. (Wright Dep., pp. 52:5-53:11, 56:21-57:1.) He has no specialized training, education, or work experience related to the effects of abuse on children with ASD. (*Id.*) He has no specialized training, education, or work experience related to how trauma manifests in children with ASD. (*Id.*) He has no specialized training, education, or work experience counseling students with ASD suffering from the result of abuse. (*Id.*) He has never been retained to provide opinions or testimony or consulting services in a case alleging that a student with autism was harmed by abuse. (*Id.*) Indeed, Dr. Wright denies outright any expertise on abuse. (*Id.*)

[4] Q:  You're not pointing to one variable or the other as the cause of these behavior changes; correct?
  A:  That's correct.
  Q:  And you're not ruling out any causes?
  A:  I'm not.
  Q:  And that includes the abuse; right?
  A:  Correct.
  Q:  Are you…opining as to whether or not the behavior changes alleged constitute effects of trauma?
  A:  I am not.
  Q:  And are you opining as to whether or not the behavior changes alleged constitute effects of abuse?
  A:  I'm not.

(Wright Dep., pp. 20:24-21:14.)

Dr. Wright offers no opinion on whether the alleged abuse occurred, or whether the acts alleged constitute abuse, but his opinions "take into account" the allegations of abuse. (Wright Dep., pp. 62:25-63:5.). His opinions do not assume that the alleged abuse occurred - or did not occur. (*Id.*, p. 65:21-25.) The abuse, according to Dr. Wright, is a variable, like any other variable, that "possibly could have affected [D.D.T.'s] behavior changes," though like the abuse, Dr. Wright offers no opinions as to whether any of these variables actually caused or contributed to D.D.T.'s injuries. (*Id.*, p. 67:1-12.)[5]

---

[5] Dr. Wright testified as follows:

Q:  And are you offering any opinions as to whether any alleged act in isolation resulted in any type of injury to [D.D.T.]?
A:  I'm not, I have no opinion on that.
Q:  Are you offering an opinion as to whether the acts alleged as a whole resulted in any type of injury to [D.D.T.]?
A:  I can't do that, no.
Q:  Are you offering opinions as to whether the alleged acts of abuse could result in injury?
A:  Not really.

(Wright Dep., p. 67:13-23.)

Q:  [W]hat I'm getting at is at the trial of the case, do you expect to be asked, hey, given all of these alleged acts of abuse, do you have an opinion as to whether that did or did not cause injury to [D.D.T.]?
A:  I would not be able to determine that.

(*Id.*, p. 68:12:17.)

Dr. Wright does not (and cannot) deny that the abuse caused or contributed to any of the injuries, nor does he (or can he) rule out the abuse as the cause or a contributing cause of any of the injuries. (*Id.*, pp. 75:21-76:7.) And he does not (and cannot) opine as to any actual causes of the injuries alleged. (*Id.*, pp. 77:19-78:19.) Thus, all Dr. Wright really does is state that any number of different variables "could have possibly" resulted in the injuries alleged – including the abuse. (*Id.*, pp. 78:23-79:14.)[6]

---

[6] With regard to D.D.T.'s dramatic weight loss, Dr. Wright goes so far as to opine that gastrointestinal ("GI") issues could possibly have caused the weight loss. (Wright Dep., pp. 79:18-80:13.) But, Dr. Wright is not an M.D., does not treat or diagnose GI issues, does not prescribe treatment for patients with GI issues, has no experience diagnosing the effects of GI or other medications on patients, does not conclude that any GI issues caused the weight loss and, critically, puts no more importance on the suspected GI issues than any other potential cause or contributing cause of D.D.T.'s injuries. (*Id.*, pp. 81:17-20, 82:24-84:2.) The same goes for Dr. Wright's suggestion that dietary changes or "pancreatic insufficiency" might have possibly led to weight loss: he does not conclude that either variable did or did not cause or contribute to D.D.T.'s injuries – instead defaulting to his oft-stated "it's a possible piece of the puzzle" response. (*Id.*., pp. 84:17-18; 84:24-85:25.) And, again, the same goes for any possible effects of medications on weight or other behaviors – he can't say one way or the other whether any medications did or did not cause D.D.T.'s injuries except, basically, "maybe." (*Id.*, pp. 87:19-88:4; 89:1-4.) And of course, again, even where Dr. Wright discusses medications, health issues or historical variables, he does not (and cannot) rule out the abuse as the cause of any injuries.

Throughout his deposition, Dr. Wright simply equivocates on potential scenarios. For example, on whether abuse, or medications, or GI issues could have caused or contributed to D.D.T.'s dramatic weight loss, Dr. Wright cannot say:

Q:    …[A]re you concluding that the weight loss was not the result of abuse[?]

A:    I'm not.

Q:    Are you able to rule out abuse as the cause of the weight loss?

A:    No.

Q:    In this opinion number 3, are you able to rule out abuse as a contributing cause of the weight loss?

A:    No, I'm not able to rule it out as a contributor.

Q:    You can't conclude that the weight loss was caused by abuse; right?

A:    I can't.

Q:    You can't opine that the weight loss was not caused by abuse; right?

A:    I can't.

Q:    …[Y]ou can't opine that the weight loss was caused by the medications; right?

A:    I can't opine on that.

Q:    You can't opine that the weight loss was caused by GI issues or diet changes; right?

A:    No, I mean I can -- I have an opinion that it maybe was involved, but not solely, no.

Q:    I think what you're saying is that any one of these variables could have caused or contributed to the weight loss; right?

A:    That is what I'm saying, yes.

Q:    And that includes the abuse; right?

A:    …It includes factors that I have reviewed and possible other factors that I have not reviewed. ***If abuse occurred, then that would also be a likely -- or a possible factor.***

(Wright Dep., pp. 94:7-95:24) (emphasis added).

On D.D.T.'s subsequent seizures, Dr. Wright is similarly equivocal:

| Q: | …[A]re you concluding that the seizures caused the behavior changes? |
|----|----|
| A: | No. |
| Q: | Are you opining that the behavior changes caused the seizures? |
| A: | No. |
| Q: | Are you concluding that the seizures could have possibly contributed to the behavior changes? |
| A: | Could have possibly. |
| Q: | …[A]re you making any opinions as to the cause of the seizures? |
| A: | No. |

(Wright Dep., p. 97:10-23.)[7]

Similarly, Dr. Wright opines that D.D.T.'s history, which in some instances show the presence of some form of the behaviors alleged to have regressed or worsened, must be taken into consideration. (Wright Dep., pp. 100:22-101:15.)[8] But again, Dr. Wright does not (and cannot) opine that any one historical factor (alone or in combination with others) caused or contributed to the alleged injuries; nor does he (or can he) rule out the abuse in the face of these historical factors as the cause or

---

[7] Dr. Wright has no training or experience diagnosing or treating seizures in children with ASD. (Wright Dep., pp. 97:24-98:4.) Nor does he offer any opinions "one way or the other" on whether any neurological condition might have caused or contributed to any of the injuries alleged. (*Id.*, p. 99:14-19.)

[8] The "historical factors" Dr. Wright refers to in his opinions include D.D.T.'s: difficulty with environmental changes; difficulty interacting with peers; difficulty with transitions at home, school, and community; his transition to middle school; the presence or absence of certain peers; difficulty with new teachers and adults; difficulty with structure (and lack of structure) in a classroom (Wright Dep., pp. 101:21-103:7.)

a contributing cause of the injuries alleged. (*Id*., pp. 104:23-105:25.) Rather, his opinion is that "one, some, or all of these factors" (including the abuse) "possibly could have" affected the behavior changes. (*Id*.)

On how medications might relate to injuries other than weight loss, Dr. Wright opines they must be "considered," but he remains unable to opine "one way or the other" that any of the medications prescribed to D.D.T. caused or contributed to his injuries. (Wright Dep., p. 106:5-14; 106:18-23.) Like every other variable, Dr. Wright merely concludes that any of the medications D.D.T. might have been taking "possibly could have caused or contributed" to his injuries. (*Id.*) Dr. Wright cannot opine "one way or the other" that any medications did or did not cause the injuries alleged. (*Id*.)

Nor can Dr. Wright determine the effects of the name-calling or rude, disrespectful, unkind, or abusive language used daily with D.D.T. (Wright Dep., pp. 107:9-13; 107:16-108:12.) He does not conclude such behavior had no effect on D.D.T., is unable to determine what effect such behavior had on D.D.T., and cannot rule out the name-calling and abusive language as a cause of D.D.T.'s injuries. (*Id*.) To the contrary, Dr. Wright concedes the name calling and abusive language could have caused or contributed to D.D.T.'s behavioral changes and regressions. (Wright Dep., pp. 109:14-19; 109:23-110:4.)

**b. Dr. Wright's Criticism of Dr. Mueller.**

Dr. Wright's main criticism of Dr. Mueller's opinions is based on his assumption that Dr. Mueller did not have sufficient information upon which to conclude that the abuse caused or contributed to D.D.T.'s injuries, and/or that Dr. Mueller failed to rule out the other variables he identified. (Wright Dep., pp. 113:24-114:3; 114:8-14.)  However, he concedes that he does not know what information Dr. Mueller did or did not have, does not know what Dr. Mueller reviewed or did not review, and assumes that, in fact, Dr. Mueller ruled out the variables he identified in forming his opinions. (*Id.*., pp. 113:24-115:17; 120:16-121:3; 125:24-126:2; 126:22-127:9.)[9] Ultimately, Dr. Wright admits that he just came to a different opinion than Dr. Mueller. (Wright Dep., p. 128:12-21.)[10] Dr. Mueller, in fact, considered and ruled out these "variables" as causally linked to the injuries. (*See*

---

[9] Though not clear from his testimony, Dr. Wright seems to conclude that Dr. Mueller did not rule out the identified "variables" as possible causes of D.D.T.'s injuries merely Dr. Mueller's written report did not specifically discuss them. However, Dr. Wright does not know if, in fact, Dr. Mueller did or did not rule out the other variables as causal links – but indicates that he believes Dr. Mueller did: "By not putting them in his report, I assume that he ruled -- I assume he ruled them out. [I] mean I don't know whether he ruled them out or in." (Wright Dep., p. 120:16-21.)

[10] The "different opinions" arrived at by Dr. Wright are those outlined in Section II. a. above.

Deposition of Michael M. Mueller, attached hereto in relevant part as Exhibit "C," at pp. 219:25-220:14.)

## II.    ARGUMENT AND CITATIONS OF AUTHORITY

### a. Legal Standard.

The United States Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993), and the text of Rule 702 require trial judges to serve as gatekeepers in determining the admissibility of expert testimony. *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Courts routinely look to three elements to determine if an expert is qualified under *Daubert* and Rule 702.  As the Eleventh Circuit Court of Appeals has stated, the elements for consideration are whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted).

As to qualifications, an expert may be qualified "by knowledge, skill, experience, training, or education." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010).  The expert need not have experience precisely mirroring the case at bar to be deemed qualified. *See Maiz v. Virani*, 253 F.3d 641,

665 (11th Cir. 2001). However, where an expert does have experience directly applicable to an issue at bar, experience alone may provide a sufficient foundation for expert testimony. *Frazier*, 387 F.3d at 1261.

As to reliability, courts look, when possible, to: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94. These factors are not exhaustive, and "a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). At all times in this flexible inquiry, a court's focus must be "solely on principles and methodology, not on the conclusions that they generate." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (citation omitted).

Finally, as to the third *Daubert* factor, expert testimony is likely to assist the trier of fact to the extent "it concerns matters beyond the understanding of the average lay person and logically advances a material aspect of the proponent's case." *Kennedy v. Elec. Ins. Co.*, Case No. 4:18-cv-148, 2019 WL 2090776, at *5 (S.D. Ga. May 13, 2019) (citing *Daubert*, 509 U.S. at 591); *accord Frazier*, 387 F.3d at 1262–

63. Rule 702 permits experts to make conclusions based on competing versions of the facts, but those conclusions must still assist the trier of fact by explaining something that is "beyond the understanding of the average lay person." *Jackson v. Catanzariti*, No. 6:12-CV-113, 2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (citing *Frazier*, 387 F.3d at 1262). Expert testimony generally will *not* help the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* (quoting *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). Such testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys.*, 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

Moreover, in order for proffered testimony to assist the trier of fact, the relationship between the opinion and the facts must "fit." *See Daubert*, 509 U.S. at 591. There is no fit where large analytical leaps must be made between the facts and the opinion. *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Where proffered testimony offers nothing more than the "possibility" of a causal link or suggests variables that "possibly could" have some connection to the facts and outcomes, such testimony does not assist the trier of fact. *See Frazier*, 387 F.3d at 1263; *accord McDowell v. Brown*, 392 F.3d 1283, 1299

(11th Cir. 2004); *Bowers v. Norfolk Southern Corp.,* 537 F. Supp. 2d 1343, 1368

(M.D. Ga. 2007).

> **b. Dr. Wright's Causation Opinions Must Be Excluded: The Speculative Possibility that Certain Variables "Possibly Could Have" Some Relationship To The Injuries Alleged Does Not Assist The Trier Of Fact.**

At issue here is the causal relationship between the abuse suffered by D.D.T.

in his classroom and the injuries suffered due to that abuse. Dr. Mueller opines that

the injuries alleged were caused by the abuse. Dr. Wright agrees, kind of, and

disagrees, kind of.  He does not rule out that the abuse caused or contributed to the

injuries.[11] He agrees that the abuse, along with other variables, "could have possibly"

caused the injuries. He is unable to point to any other variable (solely or in

combination with other variables including abuse) that caused or contributed to the

injuries.  At best, he opines that any and all identified variables, including the abuse,

alone or in combination, could have possibly caused or contributed to D.D.T.'s

injuries—or also maybe not.  And he places no more importance or likelihood on

any single potential variable in his causation analysis. This type of equivocal

testimony has been held time and again to be inadmissible: it does not assist the trier

---

[11] Nor could he give his admitted lack of education, experience, understanding or treatment of the effects of abuse on children with ASD.

of fact and serves only to confuse the jury.  Dr. Wright's causation opinions must, therefore, be excluded.

For example, in *Clarke v. Schofield,* a father sued over the death of his son, alleging that a beating he suffered at the hands of jail officials caused a pulmonary embolism as a complication of deep vein thrombosis ("DVT"), which caused his death. 632 F. Supp. 2d at 1352 (M.D. Ga. 2009). Like here, the issue in *Clarke* was the casual relationship between the beating and the injury. *Id.* at 1355. The plaintiff theorized that the DVT from which the blood clot dislodged was caused by a month earlier beating perpetrated by jail officials. *Id.* Plaintiff's proffered expert testified that "'some minor damage to [the femoral vein] **could** easily develop a buildup of clotting material at a slow rate over a period of time that **could** coincide with acute, subacute, or even chronic formation of—thrombus," and that "'[t]he prior injury **could** have caused the development of—a thrombus or a clot.'"" *Id.* at 1369 (emphasis in original). The expert further testified that "'with a bruise that size, damage to the vessel wall **could** occur'" and "'there's a **possibility** that [the decedent's] left femoral vein was damaged and it just wasn't identified.'" *Id.* (emphasis in original). Finding the expert's testimony to be unduly speculative, the district court explained that his "'could, could, could' testimony and 'possibility'

opinions add[ed] nothing to assist the jury," and consequently excluded the expert's testimony. *Id.* at 1369-70.

Dr. Wright's testimony is similarly speculative. Moreover, Dr. Wright's "could, could, could" testimony and "possibility" opinions are even more remote. Dr. Wright does not (and cannot) rule out that the abuse D.D.T. suffered caused or contributed to the injuries he sustained.  To the contrary, he agrees with Dr. Mueller: "[i]f *abuse occurred, then that would also be a **likely** -- or a possible factor.*". (Wright Dep., pp. 94:7-95:24.) (emphasis added). Dr. Wright's testimony is just plain confusing and it is not testimony that will assist the trier of fact. Rather, it is the type of equivocating testimony that has been soundly prohibited. *See Clarke*, 632 F. Supp. 2d at 1369-1370.[12]

Similarly, in *Frazier,* a forensic investigator's testimony regarding what one might "expect" to observe in a sexual encounter (the transfer of body hair) was found to be too imprecise and unspecific for the jury to readily determine whether the "expectation" was a "virtual certainty, a strong probability, a possibility more likely

---

[12] *See also Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1368 (M.D. Ga. 2007) ("Dr. Baker's equivocal testimony on causation—that Plaintiff **may** have injured his back while sitting on a locomotive seat—does not assist the trier of fact to determine proximate cause."); *Beasley v. Northside Hosp., Inc.*, 289 Ga. App. 685, 689–90 (2008) (excluding expert testimony that because they lacked sufficient certainty and left leaving the jury devoid of information sufficient to make a legal judgment).

than not, or perhaps even just a possibility." *Frazier,* 387 F.3d at 1266. Just like the expert in *Frazier,* Dr. Wright's "could have possibly caused or contributed to the injury" testimony is imprecise, likely to confuse or even mislead the jury, and must be excluded as it will not assist the jury. (*Id.*)

Finally, though not directly on point due to the specific standard for expert causation testimony in products liability cases, the reasoning in *Krik v. Crane* is instructive. 76 F. Supp. 3d 747 (N.D. Ill. 2014.) There, the district court found expert testimony unreliable where the expert could not determine that a particular exposure to a carcinogen caused injury, but instead, relied upon "cumulative" exposure to a carcinogen. *Id.* at 752. The court found that this proffered testimony was unreliable because it essentially opines that it is impossible to determine which particular exposure to a carcinogen caused the complained of injury. *Id.* This is exactly Dr. Wright's opinion: that it is impossible to opine. Dr. Wright is unable to conclude that the variables (solely or in combination), including the abuse, caused the injury or had any effect on D.D.T. whatsoever. But again, nor does he (or can he) rule out any variables, including the abuse. Like the inadmissible testimony in *Kirk,* Dr. Wright merely throws out a number of possible variables that alone, or in combination with one another, and the abuse "could possibly" have caused or contributed to D.D.T's injuries. Or not. Such imprecise and unspecific opinions do

not advance any material fact issue in the case, are speculative and vague and, as a result, fail to assist the trier of fact. They must, therefore, be excluded. *See McDowell*, 392 F.3d at 1299 (excluding expert from testifying that "earlier treatment is better" because the testimony is too vague to provide the jury with any insight into causation); *Frazier*, 387 F.3d at 1263 (excluding expert testimony as unhelpful because an imprecise and unspecific opinion does not help the jury determine what likely happened); *Bowers,* 537 F. Supp. 2d at 1368 ("'May' is not synonymous with 'probable.' 'May' connotes something merely possible, not probable… [The expert's] use of the qualifier 'may,' therefore, does not 'logically advance a material aspect of [the] case.'").

### c. Dr. Wright's Criticism That Dr. Mueller Failed to Rule Out Variables As Possible Causes Of D.D.T.'s Injuries Is Moot.

Dr. Wright's principal criticism of Dr. Mueller's report is based on his assumption that Dr. Mueller did not have sufficient information upon which to conclude that the abuse caused or contributed to D.D.T.'s injuries, and/or that Dr. Mueller failed to rule out the variables his report identifies. (Wright Dep., pp. 113:24-114:3; 114:8-14.) However, Dr. Wright conceded that he did not know what information Dr. Mueller had or did not have, did not know what materials Dr. Mueller reviewed or did not review, and assumed that, in fact, Dr. Mueller ruled out the variables in coming to his conclusions. (*Id.*, pp. 113:24-115:17; 120:16-121:3;

125:24-126:2; 126:22-127:9) Ultimately, Dr. Wright admits that he just formed a different opinion than Dr. Mueller. (*Id.*, p. 128:12-21.)

As discussed above, his "different opinion" is merely that a number of variables, in addition to possibly the abuse, could also have possibly caused or contributed to D.D.T.'s injuries—but also maybe not. Such equivocal and unhelpful opinions—which are really no opinions at all—are not helpful or admissible. Nor should Dr. Wright's unfounded criticism that Dr. Mueller failed to rule out the variables as causes be admitted. Dr. Mueller, in fact, ruled out these other variables as causing or contributing to D.D.T.'s injuries.[13] Ultimately, Dr. Wright also assumes the same. The rebuttal testimony is, therefore, moot and should be excluded.

---

[13] Dr. Mueller testified as follows:

   Q.   Okay. So fair to say that you -- if you don't think there are any possible alternative explanations you didn't do anything to try to rule out -- rule them out, correct?

   A.   No, I don't think that's fair. Again, I looked at what medical records and psychiatric records and medication records he had. I looked at his IEPs. I looked at -- I looked at the BIPs. I read the testimony. I didn't -- maybe your -- the way that you're saying rule out has a -- has a different meaning, but I looked at all the -- what I feel are reasonable alternatives and possible excuses and *none of those to me has the same power as someone reacting to ongoing abuse*.

(Mueller Dep., pp. 219:25-220:14.) (emphasis added).

## III.   **CONCLUSION**

For the reasons argued above, the causation testimony of Dr. Wright identified above, along with his rebuttal testimony regarding Dr. Mueller's opinions, must be excluded.

Respectfully submitted this 17th day of January 2023.

**FRIED BONDER WHITE, LLC**

*/s/ David S. Fried*
Joseph A. White
Georgia Bar No.: 754315
jwhite@friedbonder.com
David S. Fried
Georgia Bar No.: 277319
dfried@friedbonder.com

730 Peachtree Street NE, Suite 600
Atlanta, GA 30308
Phone: (404) 995-8808
Facsimile: (404) 995-8899
*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing was prepared using Times New Roman font, 14-point type, which is one of the font and print selections approved by the Court in L.R. 5.1(C).

This 17th day of January 2023.

FRIED BONDER WHITE, LLC

/s/ David S. Fried
Joseph A. White
730 Peachtree Street NE, Suite 600    Georgia Bar No.: 754315
Atlanta, GA 30308    jwhite@friedbonder.com
Phone: (404) 995-8808    David S. Fried
Facsimile: (404) 995-8899    Georgia Bar No.: 277319
*Attorneys for Plaintiff*    dfried@friedbonder.com

## CERTIFICATE OF SERVICE

This is to certify that I have, this day, filed the foregoing **Plaintiffs' Daubert Motion to Exclude or Limit the Testimony of Defense Expert Dr. C. Baker Wright and Memorandum of Law In Support Thereof** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all parties of record as follows:

Jeffrey R. Daniel
Sherry H. Culves
Parker, Poe, Adams & Bernstein, LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, GA 30309
jeffdaniel@parkerpoe.com
sherryculves@parkerpoe.com
*Attorneys for Defendants*

This 17th day of January 2023.

FRIED BONDER WHITE, LLC

*/s/ David S. Fried*
Joseph A. White
730 Peachtree Street NE, Suite 600        Georgia Bar No.: 754315
Atlanta, GA 30308                         jwhite@friedbonder.com
Phone: (404) 995-8808                     David S. Fried
Facsimile: (404) 995-8899                 Georgia Bar No.: 277319
*Attorneys for Plaintiff*                 dfried@friedbonder.com