# EXHIBIT "A"



C. Baker Wright, PhD, BCBA-D

## Clinical Review
9/27/2022

Civil Action case 1:20-cv-4666
D.D.T. v. Rockdale County Public Schools, R. Goerner, D. Pollard and D. Lesesne

**I. Complaint and scope of engagement:**
I have been retained by the Parker Poe law firm for my expert opinion on documents related to the above cited case based on my expertise in the areas of Autism, school-related behavioral services and consultation, and Applied Behavior Analysis (vita is attached)[1].

This specifically pertains to alleged effects of alleged abuse from a classroom teacher (D. Pollard) and classroom paraprofessional (D. Lesesne) soon after his transition into the General Ray Davis Middle school during the 2018-19 school year. D.D.T.'s parents filed the complaint on behalf of student D.D.T. who they believe suffered emotional, physical and behavioral damage in the forms of weight loss, anxiety, and behavioral regression in the form of increased aggression and social withdrawal.

Therefore, the purpose of this particular review is to summarize and comment on specific information regarding D.D.T. and his behavioral history across school settings throughout his elementary and middle school years and to provide an analysis of behavior, behavior changes, and variables likely affecting his behavior over time. Additionally, and more specifically, I have also been asked to provide my opinion related specifically to the opinions and findings made by Dr. Michael Mueller, PhD, BCBA-D, IBA.

**II. Relevant Behavior Analysis background and procedure:**
For the vast majority of my career, I have provided Behavior Analysis services and consultation to private, public, and charter schools, school districts, and individual students in a variety of educational arrangements. During the most recent 20 years of my career, I have regularly conducted trainings on various topics of Behavior Analysis, Autism, Developmental Disabilities, other behavior disorders, and implementation of Functional Behavior Assessments, Behavior Intervention Plans, the use of Applied Behavior Analysis in the Classroom setting. Many of these trainings occurred within school settings and with school professionals and administrators. Additionally, I have provided direct Behavior Analysis services in clinic, home, and community settings for individuals with Autism, other developmental disabilities, and typically developing children with exceptional behavioral challenges as well as supervised other Board Certified Behavior Analysts, Board Certified Assistant Behavior Analysts and Registered Behavior Technicians in clinic, community, home and school based environments.

---

[1] Agreed upon retainer fee is $300/hour (consultation, document analysis and report preparation), $500/hour for deposition and in-person testimony not requiring travel to the local area.

As a Board Certified Behavior Analyst – Doctoral level (BCBA-D), I have reviewed this information as I would if it was an individual under my care as a clinician. Essentially, my review of this information is what I would determine to be important and necessary for any behavior analyst looking into the assessment and treatment of this individual. My explanation in the report is not only to review the information, but also to lend questions a behavior analyst would ask and attempt to answer in a thorough assessment prior to or during treatment.

The goal of assessing the behavior of any individual who is experiencing challenging behavior is to identify, pinpoint, and assess evidence related to behaviors that seem to interfere with the individual's social, academic and behavioral progress. Additionally, it includes a review of documentation and data related to any physical, environmental, social, and/or medical variables that could be related or somehow connected to the presence, absence, or change in those targeted behaviors. It also includes a review of behavior patterns and behavioral history over time and within different environmental conditions.

As a part of a thorough assessment, and also in following our professional and ethical guidelines, it is necessary to rule out, or at least attend to any of these environmental factors which may be affecting the behavioral health of the individual, especially before proceeding with behavior intervention or assuming function of a behavior regardless of an overriding physical ailment, pain, or condition. For example, if an individual starts to bite other people or him/herself, it is important to review the individual's dental health and other possible physical variables involved prior to implementing a behavior strategy to decrease the biting behavior. If the individual had a cracked tooth, an infected gum or tooth, or some other dental condition, a behavioral intervention would be less likely to be effective. Importantly, it would also be unethical to simply apply behavioral interventions while not attending to the fact that as soon as the infection clears or the tooth is pulled, that the behavior would go away on its own.

For individuals with Autism, especially those who do not communicate with spoken words, this assessment of contributing environmental variables is even more critical in determining what makes the individual more or less likely to engage in target behaviors or behaviors of concern. From there, we can take a next step to determine behavioral function: why a certain behavior continues to occur in similar circumstances. This must be done with a knowledge of the environment, as behaviors do not have a single function or purpose. The same behavior can have different functions at different times and under different circumstances.

For example, running during a road race often results in a positive physical feeling and/or the positive praise and attention from others for crossing the finishing line (therefore making that person more likely to run again in the future in these circumstances). However, running from an angry animal has the benefit of escaping from the animal and avoidance of getting attacked (making it more likely that person will run again in the future in these circumstances). This is the same behavior, but different function under different environmental conditions. It is not helpful to simply say, "running has a function of attention" or "he is running for escape."
Another example is based on current needs experienced by the individual. Having not eaten in ten hours makes certain food searching behaviors highly likely. Those behaviors – looking in the refrigerator or pantry – are then followed by access to food. In future events of experiencing hunger, looking in the pantry or the refrigerator, is then more likely to occur due to the benefits experienced in the past (finding the food). However, once that food is eaten, those searching

behaviors are much less likely, as the food has lost its value because the individual is no longer hungry.

For the purposes of this review, and with any analysis or assessment of behavior, researching as many of these variables as possible will help formulate a more complete understanding of the role of different aspects of that person's behavior: physical environments, sensory needs, medical conditions, role of Autism related characteristics.

This information pertains to my review of the facts of this case, as I am not in a place to determine whether or not any abuse took place. My role in assessing this from a behavior analytic perspective is to take as much information as I can from medical, social, educational, and environmental histories and ask questions and make recommendations, based on the data and reports, about D.D.T.'s behavioral patterns across time. Questions have been raised about the possible effects of alleged abuse, so it is important to look at his behavior before, during and after certain time periods and determine what variables would reasonably affect his behavior and if any of these behaviors could be directly linked to any one variable or change.

**III. Summary of findings:**
Based on my review, I believe the following:
1. In a review of the evidence, there are several factors that could have caused or contributed to D.D.T.'s behavior. The only reports of alleged abuse were solely from the mother who received her information through information provided to her by the paraprofessional, Ms. K█████ W███. This is not to say it occurred or did not, but since this is the only record of the alleged events, and those alleged events are in dispute, further assessment of behavior change and the other variables is necessary.

2. There is evidence of several other relevant changes and factors which could have also contributed to or explained behavior change, making it nearly impossible to suggest any behavioral changes were due to only one of those variables, even if alleged abuse were to have occurred. Some of that evidence is detailed below.

3. D.D.T.'s extensive medical history is an important factor related to changes in his weight, which were reported to be a direct effect of alleged abuse. There is a lot of medical information related to his gastrological health and treatment from to 2014 and extending into 2021 that applies directly to weight gain and weight loss, including medical conditions (e.g., pancreatic insufficiency), medications, medications for GI symptoms, and diet/diet changes. Additionally, some medications he was prescribed were also noted as having side effects of weight gain. This information is necessary in assessing the potential causes of weight fluctuations.

4. Although the onset of seizures did not occur until shortly after D.D.T. transitioned out of Ms. Pollard's classroom, it is an additional medical condition which can and should be reviewed regarding behavior change. Some of these seizures were grand mal seizures, but some were "absence" seizures, which included "staring" off, something that someone had previously described D.D.T. doing regularly before the seizures were realized. It is possible his seizure activity could have been a contributing factor, as agitation, irritability, and other behavioral changes can be tied to seizure activity.

3

5. D.D.T.'s significant history of challenging behavior before, during, and after his time at Davis Middle School also must be considered and is relevant to the assessment or analysis of any possible effects of any alleged abuse. His difficulty with environmental changes, social interactions with other peers, and difficulty with transitions at home, school, and community are well established and reported over time since early school experiences. More specifically, there are several factors related to his transition to middle school which would have been very reasonable and historically supported explanations of his increase in challenging behavior. At the very least, his established responses to these environmental changes (presence/absence of certain peers, difficulty with transitions and new places, difficulty with new teachers and adults, differences in structure or lack of structure of the classroom, etc.) make it nearly impossible to say one way or the other that any any abuse directly and solely caused those immediate changes in behavior or longer term behavioral effects.

6. For individuals with Autism who do not communicate with spoken words, especially those with low cognitive abilities, response to verbal instructions and spoken words of others can be a significant deficit. There is quite a bit of information from teachers and parents detailing the deficits of D.D.T.'s receptive and expressive language. These individuals often struggle responding to simple questions and simple directions, making it incredibly difficult or impossible to fully assess how much that individual is receiving in terms of information from others. Individuals with Autism with the delays and deficits of this particular student often do not understand or respond to typical forms of nonverbal communication – voice tone, inflection, spacing of words, some gestures, figures of speech, nuance, suggestive language, social language, or inferences. Even for individuals with Autism who display high cognitive functioning, they often struggle the most with these forms of communication and tend to be very "literal" in their interpretations of communication. With this understanding it is also nearly impossible to determine effects of (or even if D.D.T. would understand) any alleged name-calling or forms of language one might refer to as "rude," "disrespectful," "unkind," or "abusive." Statements made with harsh, loud, or unpredictable volume or unwanted physical interactions can cause a behavioral reaction, but this is more about the aversiveness of the sound or interactions rather than the perceived aversiveness of what was said. Of course, this does not allow for or excuse the use of harmful or disrespectful language towards individuals with Autism or other developmental disabilities or communication deficits.

7. A report written by Dr. Michael Mueller, PhD, BCBA-D, IBA assumes the abuse took place as described by the paraprofessional and parent, and suggestions about behavior change were made in the context of that assumption. Further analysis into other information relative to D.D.T.'s behavioral and medical history was seemingly not conducted to explore other possible factors leading to behavior change. Additionally, whereas he detailed important procedures that need to be taken to formulate an opinion about behavioral function (observation, data collection, training, data analysis, etc.), and noted there was no evidence any of these steps were taken by the school or teacher, he made an opinion and statement about behavioral function without those data, without those observations, and without conducting the steps he prescribed. Whereas there is substantive information in this report, it is incomplete and does not include an assessment of many other variables associated with D.D.T.'s behavioral health.

4

8. Statements were made in Dr. Mueller's report directly connecting the presence of improper or incomplete BIPs and staff training to the likelihood of abuse, suggesting if the BIP is not accurate or complete then teachers and paraprofessionals are likely to engage in "verbal or physical abuse, restraint, and other harmful and restrictive procedures that can have a life-long negative impact on the learner. In my professional experience being in hundreds of classrooms and across many students of varying ages and abilities, I have encountered many Behavior Intervention Plans that were insufficient, not based on solid FBAs and not supported by adequate data. I have encountered many teachers and paraprofessionals who were not adequately trained, as this is the nature of my job in many of these situations – to train and support them. Not having proper BIPs, FBAs or training is not a direct path to abuse.

## IV. Items reviewed for the purposes of assessment:

For this review I have reviewed the following records that were made available to me.[1]

- Complaint and summons
- W███ emails
- Video taken from Ms. K. W███ (classroom video)
- Report from Dr. Michael Mueller, PhD, BCBA-D, IBA (8/29/2022)
- IEP 4/20/2016
- Newton County Psychoeducational Assessment and Report 3/22/2016
- Newton County Behavior Intervention Plan 5/17/2016
- IEP 1/30/2017
- IEP 10/17/2017
- IEP 1/24/2018
- IEP 4/27/2018
- IEP 8/28/2018
- IEP 11/09/2018
- IEP 1/23/2019
- Rockdale Public Schools Seizure Action Plan
- Occupational Therapy Update 1/18/2018
- Deposition, C███ - 8/17/2022
- Deposition, C███ – 4/18/2022
- Deposition, W███ – 8/4/2022
- Deposition, T███, D – 4/19/2022 (portions)
- Deposition, McCray – 4/27/2022 (portions)
- Medical records from Marcus Autism Center, GI Care for Kids, Conyers Pediatrics, Egleston Hospital, Sunrise Pediatric Neurology – range of dates from 9/17/2014 – 6/8/2021

I did not perform any direct assessment of D.D.T., did not observe the student at any time or speak with his family members, teachers or staff at his schools, or any other professionals involved in his care. This review was strictly a review of the documents made available to me. I

---

[1] Some other documents were received and reviewed, but may not be referred to in the findings, as they may not have been related to D.D.T.'s behavior or progress at school, such as employment records, withdrawal notice from Rockdale County Schools, letters from The Marcus Center, etc.

5

reserve the right to amend or add to these findings if at any time more evidence becomes available.

**V. Relevant education/school information:**

Student D.D.T., born 4/15/2007 (currently 15 years old), is a young man diagnosed with Autism and ADHD who was served through the Newton County and Rockdale County School systems under the Significant Developmental Delay (SDD), Autism, and Speech/Language Impairment exceptionalities, and was served in self-contained classrooms for students with significant learning and behavioral needs. Across the years of IEPs and other documents reviewed, D.D.T. was non-verbal and had cognitive functioning scores in the extremely low range (ABAS-II General Adaptive Composite Score of 48 in March 2016). Within his 4/20/2016 re-evaluation, it noted his cognitive scores were incredibly low and untestable in many circumstances. Throughout his IEPs, his skill acquisition goals focused on early learning skills such as basic communication (gestures and use of technology), turn-taking, use of classroom technology and tools for small academic tasks, gaining attention of others in a socially appropriate manner, selecting by pointing or touching, and greeting others in a socially adaptive manner. In areas of social, academic, adaptive, communication and behavioral functioning, D.D.T. had considerable deficits and behavioral excesses associated with Autism as well as his cognitive and communicative deficits. Across many years, documents note ongoing and persistent challenging behaviors of aggression towards peers and adults (e.g., hitting, scratching, grabbing, kicking), self-injury (e.g., self-biting), throwing objects, and "emotional outbursts."

Records from 3rd grade at Newton Elementary (2015-2016 school year) indicated he "does not have a consistent mode of communication" and required a high level of physical prompting with most tasks. Additionally, it noted the following behaviors: "physical aggression, mouthing inedible objects/body parts, social isolation/withdrawal, preoccupation with body parts, self-abuse, property destruction, stimulus over sensitivity, poor safety awareness, compulsive or rigid, rejects change, lacks real fear, irrational fears, noncompliant, food stealing, hoarding, hyperactivity, easily agitated." At the time it also noted he "screams, bites his thumb, sucks his thumb, cries a lot, runs around the classroom, does not accept any change during the daily schedule."

These behaviors and skill deficits continued to be reported throughout his IEPs and Behavior Intervention Plans (BIP) at Newton Elementary and into Lorraine Elementary School in Rockdale County Public Schools (RCPS) where he enrolled in January of 2017. His BIP goals transferred from Newton to Lorraine, which included "aggression towards teachers, paraprofessionals and peers" as well as "emotional outbursts that lead to behaviors such as throwing objects and books." Later in October in 2017, D.D.T.'s teacher noted "throwing has not been an issue," but he "tends to act out when frustrated." At the time, Ms. C▮▮▮, D.D.T.'s mother, noted, "he grabs, scratches, and sometimes kicks adults" and that his "inappropriate behavior is likely due to changes in the classroom dynamics from last school year," seemingly referring to the change in schools. This statement is of particular interest, as this seems to appear in other places and highlights a notable factor in behavior change in the move to his middle school classroom. This is also a very common characteristic of students with Autism, especially those who do not communicate with spoken words and with cognitive deficits similar to D.D.T.

During the 2017-2018 school year (5th grade), he continued to "require prompting with behaving appropriately" and target behaviors continued to include "hitting, grabbing, scratching, kicking,

6

jumping out of his chair, and biting himself/others." During this school year it also seemed the BIP was relatively unchanged from previous years.

The following year, D.D.T. transitioned to General Ray Davis Middle School where he was in the classroom taught and supported by Ms. Pollard (lead Special Education teacher) and Mr. Lesesne (paraprofessional). This was a change not only in teachers and support staff, but also the school building and location. An IEP meeting was held on August 28, 2018 seemingly based on difficulties with D.D.T.'s behavior. The meeting minutes noted the "transition to middle school has resulted in increasingly aggressive behaviors that are escalating to a level that has not existed for several years" and there were some recommendations to update the BIP. On 11/9/2018, the team met again to discuss the difficulties with his behavior at which time Ms. C███, D.D.T.'s mother, noted she, "knew behaviors may manifest since [D.D.T.] does not typically do well with change," but noted his behavior in other public places was "manageable." Ms. Pollard noted "[D.D.T.] would not leave the room for the first 3 months at the start of the school year," but that he had "improved recently with his moving around the school". There was also information regarding another student in the room to whom D.D.T. seemingly was poorly reacting. It was noted that D.D.T. had previously been in a class with this other student before and there had been "previous conflicts." These are notable environmental factors associated with this move which are critical pieces of understanding his behavior change.

D.D.T. returned to school to a new teacher and paraprofessional in January 2019 following Ms. Pollard and Mr. Lesesne being assigned to other classroom assignments. Although D.D.T. continued to aggress towards peers and adults, it seems his behavior improved and was making progress. Ms. C███ did ask to remove a section in the IEP relating to taking D.D.T. out into school-wide activities because he "does not like noise or any other type of excitement." Along with the personnel changes were overall changes to the routine of the classroom: "students follow a routine schedule with frequent breaks in between functional lessons, students have been spending more time out of the classroom to include visits to the tennis courts daily, delivering the "mail" to the media center and school nurse to help provide a change of scenery as well as provide more adult interaction." Throughout this time, the BIP remained the same as it had been in previous years. Again, parents attributed behavioral improvements to the absence of Ms. Pollard and Mr. Lesesne, but this is only a single potential factor amongst several other important and relevant factors as it relates to his behavior change.

D.D.T. was withdrawn from Rockdale County Public Schools on 10/14/2019 seemingly to attend intensive day treatment services within the Severe Behavior Program through The Marcus Center. As noted below, this had been the recommendation of treating physicians for quite some time.

**VI. Relevant medical background and information:**
A review of medical records revealed an extensive medical history and frequent medical involvement for conditions related to his gastrointestinal health (much of which is covered in reports from GI Care for Kids and Conyers Pediatrics), behavioral health (e.g., hyperactivity, self-injurious behavior, aggression, elopement), psychiatric health and treatment (mostly seen in reports from the Marcus Autism Center) and neurological health (e.g., seizure activity noted and treated by Sunrise Pediatric Neurology).

7

Weight loss/Gain
From very early records, there is information regarding D.D.T.'s difficulties with his GI health. He was seen in September 2014 (7 years old) by GI Care for Kids at which time he was in the 37th percentile of weight and was treated for some concern of constipation. Also around this time, possibly very soon after this visit, it was noted that D.D.T. had a poor reaction (described by his mother as "self-destructive" behavior) to Metoclopramide, which is a medication that "speeds up the rate at which the stomach empties into the intestines" and is typically prescribed for stomach discomfort or GI distress (https://www.drugs.com/metoclopramide.html). It is unclear if this was first prescribed to him at this time, but it was reported throughout many medical records that he had this poor reaction to it. However, the presence of the prescription does indicate problems in this area as early as 2014.

He was later seen in July and August 2016 by the Marcus Autism Center for the feeding disorders clinic as he was "only eating certain foods." A report from Conyers Pediatrics in April 2017 noted "good appetite, good eating habits," but excessive urination and appetite, but weight loss since the previous visit. He had other seemingly annual or routine visits with Conyers Pediatrics and a visit in December 2018 noting the weight loss and his appetite being "maybe a little less, but not a big change." It was also around this time there was seemingly an increase in food seeking behaviors, including in grocery stores and home. GI Care for Kids followed up in January 2019 for an "evaluation of weight loss" at which time the parent noted he was refusing to eat chicken or rice and that he "chews the food and then spit it out." The parent also noted, "he has no issues when he eats fruits or vegetables," and that he "loves pasta." There were other visits around this time to Marcus Autism Center for his psychiatric visits, and another visit in February 2019 when he was prescribed ZENPEP. This seems to be an important factor for D.D.T.'s GI health as it relates to his weight loss and gain, as it is a medication which is prescribed to help "absorb the fats, proteins, and vitamins from their food" (https://www.zenpep.com/home-hcp/efficacy) and typically is prescribed to individuals with exocrine pancreatic insufficiency (EPI), a condition with symptoms including gas and bloating, diarrhea, stomach pain and unexplained weight loss" (www.TreatingEPI.com). In a report from GI Care for Kids from a visit on 6/13/2019, it notes a 22 pound weight gain "since the previous visit," which seems to be on 1/17/2019, a short time before the ZENPEP was prescribed in February. At the end of this report, it notes a "need to control portions to prevent from ongoing weight gain." There are also notes of concern about (and blood tests that revealed) high cholesterol and "elevated lipids."

Overall, this is medical information that needs to be included within an analysis of behavior changes that are alleged to be a result of alleged abuse, and seemingly weight gain which occurred as a result of the removal of the teachers. However, these events also coincided with quite a bit of GI work, including medications, and a GI/abdominal ultrasound due to "pancreatic insufficiency" (Marcus Autism Center reports 3/14/2019, 4/25/2019). This, in addition to changes in eating habits over time could very well be a cause or contributing factor when assessing or analyzing weight gain.

Psychiatric Health
There is a long history of involvement from the Marcus Autism Center in treating D.D.T. from a psychiatric perspective. This includes medication to help control hyperactivity, mood, anxiety and aggressive/self-injurious behaviors. These include, but may not be limited to Zoloft, Abilify, Tenex, Risperdal, Haldol, Vyvanse, and Prozac. It seems he was prescribed Risperdal and Tenex as early as 2014, but likely before that. As of late 2018, he was on Abilify and Tenex (seemingly

8

no longer on Risperdal). Also in December 2018, Zoloft was added. It is unclear if there was any significant effect of these medications, as behaviors seemed to come and go and then re-emerge. A note of decreased aggression and SIB at home was noted in September of 2019, following a taper off from Zoloft, and shortly after in October 2019 the Abilify was changed to Geodon due to the likelihood of weight gain with Abilify. Geodon was changed to Haldol following D.D.T.'s refusal of swallowing the Geodon pills.

This information is included as medications and side effects of medications must be considered in the analysis of D.D.T.'s behavior change, as it relates not only to his behavioral health, but also other physiological factors such as appetite suppression or enhancement and agitation reduction or intensification.

Other medical and neurological health
In the assessment and analysis of possible environmental and physiological factors, it is also important to note other factors of health that occurred around the time being reviewed. On 4/11/2019, D.D.T. experienced his first seizure for which he was treated at Egleston Children's Hospital and by Sunrise Pediatric Neurology. He was seen at the hospital and then at Sunrise at the beginning of May 2019. At the time, as the physicians and family were trying to figure out more about the seizures, the parent noted it was difficult to know "because he has Autism, he is always staring." Obviously, grand mal seizures, which he had and has had since, are easy to identify. However, "absence seizures" when individuals simply "stare off" or seem disconnected, are incredibly hard to identify in individuals with Autism.

There were repeated doctor visits, examinations, and at least one more ER visit due to seizure activity. These repeated hospital and doctor visits are also important to note as some of them were not pleasant for D.D.T. or the family. On one occasion when they were getting the lab to draw blood, it took six people to restrain him, as he was "extremely agitated, kicking, spitting, hitting." That experience alone could cause sensitivity to medical professionals, even for typically developing children. The parents suggested the alleged abuse was the cause for his reaction to medical professionals, but his hospital visits, assessments, blood draws and other experiences during this period of time were certainly very difficult experiences that could easily and reasonably explain his resistance and response to medical professionals.

**VII.   Review of Dr. Mueller report:**
As noted throughout this report, there are many factors that are involved in the assessment of any behavior and especially in looking for or determining causation of behavior. Dr. Mueller, in his report, describes many of these elements from a behavior analysis standpoint in his discussion of how things should be done and approached when assessing and treating challenging behaviors. He notes, "adherence to a functional approach is important because it pinpoints problem behaviors and explains the reasons they exist. That is, it places the problem behaviors in their proper context, with the understanding that such behaviors result from a student's disability, language, and/or communication deficits, and that those behaviors serve a clear purpose." Unfortunately, throughout his report, he did not review or analyze the other environmental, medical and physical factors which were valuable parts of the "proper context" of D.D.T.'s behavior. There is a heavy reliance on reports from the parent and Ms. W███, and this should not be the sole piece of information in determining the reason for the occurrence or the recurrence (i.e., function) of the challenging behaviors noted. His statement that the pattern of behavior "is suggestive that access to tangible (food) items reinforced aggression," and that other statements made "do not support that attention or escape reinforced the aggression" is not only based on

9

solely the reports from the parent and teacher, but also does not include any information relative to the conditions under which those behaviors were more likely to occur (i.e., GI problems). For example, an intervention based on the assumed function of access to food, even if it is correct, would likely be to reinforce an appropriate "replacement behavior" such as the use of sign language to request food by delivering food upon his more appropriate communication attempt. This, on the surface, seems complete and appropriate. However, what if D.D.T. has a medical condition that limits the absorption of valuable nutrients from the food he eats? What if he is very limited in the foods he prefers, which cause other GI distress problems or problems with an increasingly high cholesterol level. These are not exaggerated examples, but likely scenarios which highlight the necessity of a deeper analysis of many other factors than were included by Dr. Mueller.

Additionally, Dr. Mueller notes a concern: "I see no evidence of graphs, data summaries, or data analysis." This is relevant because with the absence of data, it is impossible to fully analyze behavior change over time. There were many years before and after D.D.T.'s time in Ms. Pollard's classroom when behavior challenges existed, intensified, and decreased. It is simply impossible to detail these changes and sufficiently analyze them without the data. Though a parent report can be an important part of the equation, it cannot be the sole source of data.

As it relates to other factors in the classroom, Dr. Mueller also noted data collection should include "the other variables of interest such as activity, staff who were present, etc." This statement is also accurate, which is why it is unfortunately incredibly difficult and potentially inappropriate to identify only one of those possible variables, the alleged abusive interactions between the instructors and D.D.T., as the controlling variable of the behavior changes reported. It is well-documented in the literature how students with Autism and other significant developmental disabilities tend to respond poorly to change, lack of structure, lack of predictability, and specifically in D.D.T.'s case, the presence of a loud and seemingly abrasive peer in the classroom environment (who may have also experienced a change in his behavior with the improvements of structure, activity, and engagement). Ms. C▆ noted that in several of her descriptions throughout several reports. Dr. Mueller noted deposition testimony from others describing the classroom as a "free for all…without any curriculum going on" with "too much down time" and "lack of standard classroom instruction." Classroom environments meeting that description have been known to cause these kinds of behavioral regressions and responses attributed to D.D.T. Dr. Mueller does not seem to account for that variable in the possible explanation of D.D.T.'s challenging behavior.

Dr. Mueller also points out reports from Ms. W▆ about deficiencies in the classroom and also points to the lack of or minimal information in the documentation about the Functional Behavior Assessment and Behavior Intervention Plan process and the training and support those teachers and paraprofessionals received (or did not receive). He then claims that without training or adequate support that teachers and paraprofessionals would "create[ed] their own abusive methods." Individuals in classrooms such as this do need training to be able to best serve those under their care; however, not being trained or not being trained adequately does not create abuse, as it is suggested in this report. As mentioned above, I have been in classrooms since the very beginning of my career, and it remains the vast majority of my clinical work at this time. In the course of this experience of over 20 years working with teachers, paraprofessionals, administrators, and other people who work around students with significant behavioral and learning needs, I have not seen the connection between a poorly written BIP, poorly constructed FBA, or poorly trained paraprofessional and abuse.

Finally, as written above in summary statement #6, it is nearly impossible to tease out and know the true effect of alleged verbal abuse on what Dr. Mueller states as "life-long negative impact." There is such a wide range of what can be determined to be verbal abuse, this also must be taken into account. The effects of allegedly being referred to as a comic from the 1930's (e.g., 'Frick and Frack") would be quite different from much more violent forms of verbal abuse that were not alleged in this case, but those we unfortunately understand occur in our society. Again, I am not here to assess whether or not this alleged abuse occurred or did not. I am assessing the likelihood of being able to tease out the possible effects of alleged verbal abuse, some of which is highly unlikely to be understood by D.D.T. In that effort, it is nearly impossible to do so.

**VIII.   Summary:**

To assess the potential effects of any change on behavior, a thorough assessment includes review and analysis of data on the target behaviors and as many variables associated with the behavior as possible, including but not limited to changes that occur in the environment over time. Optimally, an objective measure of the target behaviors over time would allow for a detailed analysis of behavior change and the variables that may be associated with those changes. For example, if a certain behavior was measured across several months and changes in that behavior were observed through visual analysis of the data, an analysis into other environmental changes that occurred over that time period may help to identify certain reasons for those changes. In this situation, those objective measures of behavior were not included in the reports, and do not appear to have been collected. Although physical aggression and other challenging behaviors were noted annually in the IEPs before, during, and after the alleged abuse occurred, there are no data to show changes in frequency, intensity, or duration of these behaviors. Therefore, less objective measures must be taken into account to further attempt to discover the potential behavioral effects of the alleged abuse. As noted above, this is difficult, as IEPs across the years note the same challenging behaviors, the same BIPs and relatively little information about behavior changes with the exception of the accounts of behavior change (without data) that occurred upon his transition to Middle School.

Therefore, at this time, an assessment must be made of all the potential environmental factors which could also affect D.D.T.'s behavior, based on information from before, during, and after this period of time. Since very early on in his educational records, sensitivity to change was a common factor, noted as early as the re-evaluation on 4/2016, further by teachers, and Ms. C▮ in her statement noted in 10/17/2017 IEP "inappropriate behavior is likely due to changes in the classroom dynamics" and on 11/9/2018 when Ms. C▮ noted she "knew behaviors may manifest since [D.D.T.] does not typically do well with change"). This is a very common pattern of behavior for students with significant communication deficits and other challenges associated with Autism, and it seems to have happened previously with D.D.T. It also seems to be important to note the presence of another student in the middle school classroom with whom D.D.T. had a history of poor interactions. Further, notes indicate the new teacher and paraprofessional who arrived in January of 2019 also brought an increase to the structure, routines and activities of the classroom. There were other records that Ms.Pollard had less structure, did not engage the students as much, and did not have as many activities within her classroom. If that were the case, such changes of environment and meaningful activities alone could also have a significant effect on the behavior of students with Autism and other developmental disabilities.

Anxiety and other challenging behaviors were seen and reported throughout his elementary school years with teachers noting he, "displays explosive and unpredictable behavior, is easily

11

frustrated, displays strange behavior (screams, runs around the class, spits)" and "sulks a lot and is unusually loud" (pg. 26 of Newton County re-evaluation in 4/20/2016). There are some reports that seem to indicate this got better in Lorraine Elementary towards the end of his time there, but there simply are not any data to show the nature of this change.

The other information provided above also presents more variables associated to his medical health and psychiatric care, all of which are critical in accurately and appropriately assessing his behavior and the effects of any one variable on those behaviors over time.

The purpose of this analysis was to assess the documents to form a judgement about D.D.T.'s behavior and the potential effects of alleged abuse on his behavior *and* any other contributing factors that could also play a role. It is my assessment that it is nearly impossible to tease out the specific effects of alleged abuse from other likely contributing factors which occurred before, during, and after the alleged period of time. Unfortunately, there are not sufficient "hard data" to analyze this enough to pinpoint the alleged events as the factor.

_____
C. Baker Wright, PhD, BCBA-D