# EXHIBIT "B"

D.D.T. v.

Rockdale County School District, et al.

C. Baker Wright, Ph.D.

November 15, 2022

Page 13

1  A.  No.

2  Q.  Have you spoken to Randy Goerner at all

3  about this case?

4  A.  No.

5  Q.  Do you know Dona Pollard?

6  A.  No.

7  Q.  Have you spoken to Dona Pollard at all

8  about this case?

9  A.  No.

10  Q.  Do you know David Lesesne?

11  A.  I don't know them personally.  I know who

12  these people are just in the documents review, but I

13  don't know them personally, no.

14  Q.  Understood.  And have you spoken with

15  David Lesesne about --

16  A.  I have not.

17  Q.  All right.  We've got Exhibit 1 as your

18  report.  I'm going to just ask you generally about the

19  scope of engagement.

20      MR. FRIED: Jeff, are you able to look at

21  the report?  I wasn't going to share my screen.

22      MR. DANIEL: Yes.

23      MR. FRIED: So are you able to just

24  review it?  I'm just going to be quoting some

25  language from it, so let me know if there's an

Page 14

1  issue.

2      (Thereupon, marked for identification,

3  Plaintiff's Exhibit 1.)

4      BY MR. FRIED:

5  Q.  We're going to mark your report as

6  Exhibit Number 1.  And Dr. Wright, you have that in

7  front of you?

8  A.  Yes, sir.

9  Q.  Looking at section 1, complaint and scope

10  of engagement, your engagement quote specifically

11  pertains -- and this is the second paragraph --

12  specifically pertains to alleged effects of alleged

13  abuse from a classroom teacher soon after his

14  transition into GRDMS during the 2018-19 school year.

15  Can you explain what you mean by that?

16  A.  I was asked to provide an expert opinion

17  on the behavior changes and the potential effects of

18  any alleged abuse that occurred with that particular

19  student.  And those alleged events occurred during

20  that time when the student was in that classroom that

21  I mentioned.

22  Q.  Okay.  Are you -- and I understand that

23  you -- I've read your report, and a lot of my

24  questions today -- I'm going to be asking a few

25  questions about, you know, asking you to explain some

Page 15

1  of your summaries and things like that.  A lot of my

2  questions are going to try to understand what you

3  aren't opining to so we have an understanding of, you

4  know, going on into trial or motions what you are

5  talking about and what you aren't.  So if you don't

6  understand specifically what I'm asking, just let me

7  know, hey, can you clarify that.

8      Are you offering any opinions about how

9  the alleged acts of abuse affected D█████?

10  A.  I'm offering opinions on how I would look

11  at the behaviors of this particular student over time

12  and to analyze behavior changes as well as the various

13  different contributing factors that are involved in

14  behavior change.  Now, one of those factors is the

15  alleged abuse.  But as I mentioned in the report, what

16  my goal is to look at all the information that I

17  can in trying to pinpoint or tease out what could have

18  had effects on D█████ behavior over time.

19  Q.  Yeah, I understand that, and I think

20  that's a good way to put it.  What I'm getting at, the

21  report sort of reads to me like this -- and correct me

22  if I'm wrong, and I'm not trying to box in your

23  opinions, we'll get to all of them.  But you're

24  identifying about eight opinions and saying that

25  behavior changes that we're looking at can't be

Page 16

1  isolated to the abuse, there are other factors that

2  could be considered, that could have caused these

3  changes.  Is that accurate from a high level?

4  A.  Yes, I think that that's accurate, with

5  the only stipulation being that it would be difficult

6  to tease out any singular variable, the alleged abuse

7  being one of those.

8  Q.  Yes, and so what I'm asking is are you

9  offering or are you planning on it -- and I don't see

10  them in the report -- are you planning on offering

11  opinions specifically about how the alleged abuse

12  affected D█████?

13  A.  No.

14  Q.  Okay.  The next paragraph in the report

15  states that the purpose of your review is to summarize

16  and comment on specific information regarding

17  D.D.T. -- and I'll use his name, D█████, and that's

18  appropriate for today -- and his behavioral history

19  across school settings throughout his elementary and

20  middle school years and provide an analysis of

21  behavior changes and variables likely affecting his

22  behavior over time.  It sounds to me like that's a

23  different way of saying what we just said, but can you

24  explain to me what that means?

25  A.  I'll explain it from my clinician

D.D.T. v.                                                    C. Baker Wright, Ph.D.
Rockdale County School District, et al.                      November 15, 2022

---

Page 17

1  standpoint if that's okay.  When brought in on any
2  case, and in this one in particular, there is a
3  question about the challenging behaviors and changes
4  in those challenging behaviors occurring.  And there's
5  a question regarding the events around this particular
6  period of time where he was in Ms. Pollard's
7  classroom.
8      So if I look at that clinically, I not
9  only have to look at the relevant events and relevant
10 environmental variables around that period of time,
11 but to understand it fully I have to look as much
12 before and after that event to be able to assess
13 further what I can about that particular period of
14 time.  So that's what my role was here was to try to
15 get as thorough of a before, during, and after
16 analysis relative to D████'s behavior.
17 Q.  And so if we're identifying behavioral
18 changes during this period of time, I think what
19 you're saying is to understand those changes, we need
20 to take a look at variables prior to this time,
21 variables during this time, and variables after this
22 time that may have affected these outcomes or
23 behaviors; is that fair to say?
24 A.  That's fair to say.
25 Q.  And what I'm getting at is the variables

---

Page 18

1  we're talking.  I know that throughout your eight
2  opinions and then the support for those you're talking
3  about variables, but can we assume that the variables
4  you're discussing all appear -- or the variables that
5  you're looking at to provide your opinions are all
6  provided in the report?
7  A.  I would say that the most important
8  variables that I was able to look at are included in
9  that.
10 Q.  Okay.  When you say throughout elementary
11 and middle school years, what time frame are you
12 referring to?
13 A.  I believe that the first -- I'm looking
14 at my timeline here.  There's information medically
15 going back to 2014, but IEPs going back to April of
16 2016.  There's also, you know, just some other
17 information that I ran across that went back into
18 where he went to preschool and previous elementary
19 schools prior to Rockdale.
20 Q.  And so is it fair to say that the time
21 frame that you're looking at is essentially contained
22 in the records that you were provided, from the
23 earliest notes in the records to the most present
24 notes?
25 A.  That's correct.

---

Page 19

1  Q.  Now, is it fair to say that what you're
2  pointing out when you're looking at this time frame is
3  that you're pointing to causes other than abuse that
4  could have affected D████'s behavior over time?
5  A.  I'm pointing out variables.
6  Q.  You're pointing out variables other than
7  abuse that could have affected D████'s behavior over
8  time, or variables including abuse that could have
9  affected D████'s behavior over time?
10 A.  I'm looking at any evidence of any
11 environmental changes, presence or absence of people,
12 presence or absence of any medical information,
13 medicines.  Again, from a clinician standpoint, I try
14 to gather as much information as I can and also
15 evaluate the depths of the information that I may be
16 able to get.  And what I mean by depths is hard data
17 versus -- parent report versus teacher report and in
18 some cases self-report, you know, and sort of judging
19 the differences of the reliability or validity of
20 those different measures.
21 Q.  Yeah, really what I'm asking is -- you
22 say variables, and we'll talk about the variables.  I
23 understand what you mean.  You're talking about things
24 like medications or transitions from home to school or
25 new teachers, these variables.

---

Page 20

1  A.  That's correct.
2  Q.  And I'm trying to understand what is the
3  purpose of looking at these variables.  And from the
4  scope of engagement, I'm asking are you providing --
5  are you pointing to these variables as possible causes
6  that might have affected D████'s behavior?
7  A.  Yes, they are possible, they are
8  possible.
9  Q.  But you're not providing opinions as to
10 the actual causes of D████'s behavior changes; right?
11 A.  No.
12 Q.  You're just pointing out -- and we'll go
13 through them -- and talking about different variables
14 that you see that in your opinion could possibly have
15 caused behavior changes?
16 A.  Caused or contributed to, yes.
17 Q.  Yeah, and we're talking singularly or as
18 a whole; correct?
19 A.  That's correct, that's correct.
20 Q.  Now, I may ask that question again and
21 again, but it's because I'm going to go through
22 specific opinions and specific variables that you're
23 talking to, but I just wanted an understanding.
24 You're not pointing to one variable or the other as
25 the cause of these behavior changes; correct?

---

D.D.T. v.                                                                C. Baker Wright, Ph.D.
Rockdale County School District, et al.                                  November 15, 2022

Page 21

1  A.  That's correct.
2  Q.  And you're not ruling out any causes?
3  A.  I'm not.
4  Q.  And that includes the abuse; right?
5  A.  Correct.
6  Q.  Okay.  Are you providing -- again, I
7  don't see these in here.  Are you opining as to
8  whether or not the behavior changes alleged constitute
9  effects of trauma?
10  A.  I am not.
11  Q.  And are you opining as to whether or not
12  the behavior changes alleged constitute effects of
13  abuse?
14  A.  I'm not.
15  Q.  Okay.  Back to the report, you were
16  provided materials by the attorneys and you reviewed
17  the materials, and as a result of your review of the
18  materials you produced a report containing your
19  opinions; right?
20  A.  That's correct.
21  Q.  And the report is shown in Exhibit Number
22  1; correct?
23  A.  Yes.
24  Q.  Okay.  I'm going to just go through a
25  couple of the requirements of the opinion from Rule

Page 22

1  26.  That's a federal rule that sort of outlines what
2  you need to do in the opinion, and I think it's all
3  there, but I'm just going to ask the questions.  Does
4  the report contain a complete statement of all
5  opinions you will express in the matter?
6  A.  Yes.
7  Q.  And does it contain the basis and reasons
8  for those opinions?
9  A.  It does.
10  Q.  Does the report contain the facts
11  considered in forming your opinions?
12     MR. DANIEL: Object to form.
13  A.  Yes.
14     BY MR. FRIED:
15  Q.  Does the report contain or identify any
16  exhibits that will be used to summarize or support
17  your opinions?
18  A.  I'm sorry, I didn't hear you completely.
19  Q.  Does the report identify any exhibits
20  that will be used to summarize or support your
21  opinions?
22  A.  It does.  There's one addition.  I've
23  reviewed a couple different things since I put the
24  report together that aren't on there, but yes.
25  Q.  Yeah, and I'm going to ask you -- well, I

Page 23

1  mean since you've brought it up, tell me what -- there
2  is a list of documents or medical records that you've
3  reviewed.  What additional records have you reviewed?
4  A.  There were three research -- well, there
5  were three articles that were referred to by
6  Dr. Mueller in his report.  And since providing this
7  report, I have reviewed all three of those.
8  Q.  Okay, and did you review anything else in
9  addition?
10  A.  I don't believe so, not that's not
11  already on the list.
12  Q.  Did review of those three articles change
13  your opinions in any manner?
14  A.  No.
15  Q.  Okay.  So the report as it stands, I
16  think you just testified, and with review of
17  additional articles, your report is complete and
18  contains a complete statement of all opinions you'll
19  express in the matter; correct?
20  A.  That's correct.
21  Q.  Okay.  There's a CV attached to it, so
22  the report contains your qualifications; is that
23  right?
24  A.  Yes, I believe so.
25  Q.  Is the CV attached to the report, is that

Page 24

1  a complete list of your professional experience?
2  A.  It is.
3  Q.  And I'm going to take a look at that
4  quickly.  And your CV begins on page -- well, I mean
5  it's the last section of the report, it's the last I
6  guess three pages.
7     MR. DANIEL: It's not included in the
8  exhibit that you e-mailed to us, the CV.
9     MR. FRIED: Okay, I have it attached as a
10  single one.  Does everybody have a copy of the
11  CV, and we'll just redo the exhibit?
12  A.  I don't have it printed in front of me,
13  but I can access it if that's okay.
14     BY MR. FRIED:
15  Q.  I don't know that you need to.  I'm not
16  going to ask you a lot of questions about it.  But if
17  you want, just to be thorough, why don't we take one
18  minute, I'll have Alex redo Exhibit Number 1 and just
19  send it to everybody.  And if everybody's okay, we'll
20  just substitute the new Exhibit Number 1 for the old,
21  and it's just going to be the same report with a
22  three-page CV attached at the end of it.
23     MR. FRIED: Is that all right?  Jeff, you
24  agree to doing that?
25     MR. DANIEL: Yeah, I'm fine doing that.

D.D.T. v.
Rockdale County School District, et al.

C. Baker Wright, Ph.D.
November 15, 2022

1 an off-record conversation with him about this.
2    MR. FRIED: Okay.
3    MR. DANIEL: Okay.
4    MR. FRIED: Thanks, we'll take five.
5    (Recess from 11:14 till 11:24 a.m.)
6    MR. FRIED: We are back on the record.
7 Why don't I ask the question, and Jeff, if you
8 want to object and instruct your client not to
9 answer, then we can do that and move on.
10    MR. DANIEL: I do have one proposal. So
11 I have talked over the matter with Baker. I do
12 think there are some attorney-client privilege
13 and work product concerns for that other
14 matter. He's prepared to share some
15 information, but I think any information beyond
16 that I think will probably go to
17 attorney-client privilege or attorney work
18 product. So rather than having you ask the
19 questions, would you like him to share that
20 information and then you can see if you have
21 any follow-up questions?
22    MR. FRIED: Yeah, just for the record why
23 don't I ask the question again and you can just
24 respond with the information that you want to
25 provide, and if it's adequate, I'll move on,

1 and if not, we'll make the record; okay?
2    MR. DANIEL: Okay.
3    BY MR. FRIED:
4 Q. Dr. Wright, have you ever provided expert
5 consulting or testimony in a case alleging that an
6 autistic student was harmed by abuse?
7 A. Yes, I was retained on the plaintiff's
8 side by an attorney who was representing several
9 children in that particular case. It was not Parker
10 Poe, it wasn't Beth Morris or Reagan. It was a
11 separate situation.
12 Q. And do you know if the case was ever
13 filed?
14    MR. DANIEL: Beyond this, I'm going to
15 instruct Dr. Wright not to answer on
16 attorney-client privilege and attorney work
17 product grounds.
18    BY MR. FRIED:
19 Q. Dr. Wright, are you refusing to answer
20 the question based on your attorney's recommendation?
21 A. I'm going to follow his recommendation.
22 Q. Okay, did you provide any testimony or
23 reports in that case?
24 A. Because I don't know where the line is
25 with attorney-client privilege, I'm --

1    MR. DANIEL: And Dr. Wright, I'll say I
2 don't have a problem with you answering whether
3 you provided any testimony.
4    THE WITNESS: Okay, I did not provide any
5 testimony.
6    MR. DANIEL: And I don't have a problem
7 with you saying whether you provided any kind
8 of written report in that case, without
9 disclosing the report's contents if you did.
10    THE WITNESS: I did not provide a written
11 report.
12    BY MR. FRIED:
13 Q. Okay. And were you formerly retained in
14 that case?
15 A. Yes.
16 Q. And I think your testimony was that it
17 just didn't, to your knowledge it didn't go anywhere?
18    MR. DANIEL: From there I'm going to
19 instruct the witness not to answer and provide
20 any further information about that, as I think
21 it goes to attorney-client privilege and
22 attorney work product in that matter.
23    MR. FRIED: All right.
24    BY MR. FRIED:
25 Q. So are you refusing to answer the

1 question, Dr. Wright?
2 A. I'm going to follow his recommendation.
3 I just -- I don't know where the line is on that, I'm
4 sorry.
5 Q. That's fine. Other than the case that
6 we've just been speaking about, have you ever been
7 retained to provide opinions or testimony or
8 consulting services in a case alleging that an
9 autistic student was harmed by abuse?
10 A. No.
11 Q. Okay. Have you ever engaged in any
12 course of study specific to abuse against children
13 with ASD?
14 A. No.
15 Q. Do you have any specialized training,
16 education, or work experience related to the effects
17 of abuse in children with ASD?
18 A. No.
19 Q. Do you have any specialized training,
20 education, or work experience related to how trauma
21 manifests in children with ASD?
22 A. No. I would add to that information that
23 as a behavior analyst, I have had a variety of
24 experiences with individuals who have experienced
25 trauma, different trauma in their life. Some of those

D.D.T. v.
Rockdale County School District, et al.

C. Baker Wright, Ph.D.
November 15, 2022

Page 53

1  individuals had autism, some of them did not, and some
2  had experienced a wide variety of abuse.  But I look
3  at that from a behavior analysis standpoint.  So I
4  have had experiences with many individuals who have
5  experienced trauma and abuse from the behavior
6  analytic side of things.
7  Q.   Maybe that's the answer to my next
8  question.  Do you have any specialized training,
9  education, or work experience counseling students with
10 ASD suffering from the result of abuse?
11 A.   I'm not a counselor.
12 Q.   Do you have any specialized training,
13 education, or work experience treating students with
14 ASD suffering from the result of abuse?
15 A.   I have experience working with
16 individuals who have experienced abuse and helping
17 them with replacement behaviors, as I typically would
18 with my other students and individuals that I serve,
19 as some of them have had experiences with abuse and
20 trauma, some have not.
21 Q.   Let me reask the question.  Do you have
22 any specialized training, education, or work
23 experience working with students with ASD suffering
24 from the result of abuse?
25 A.   I felt like that was two different

Page 54

1  questions.
2  Q.   I didn't hear what you said.
3  A.   I felt like that was two different
4  questions.  One was do I have specialized training and
5  then have I worked with individuals who have
6  experienced trauma or abuse.  I have worked with
7  individuals who have experienced trauma and abuse as a
8  professional behavior analyst, yes.  But I have not
9  had university specialized training in specific
10 effects of abuse.
11 Q.   And what about working with students with
12 ASD suffering from the results of abuse, do you have
13 work experience there?
14 A.   Again, as a behavior analyst, I have
15 worked with individuals with ASD who have experienced
16 trauma or abuse.  I'm working with the individual
17 child, and obviously their abuse or trauma histories
18 play a role in my treatment and my involvement with
19 them.
20 Q.   In your treatment have you treated
21 students with ASD for symptomology related to abuse?
22 A.   I don't know that we determined that the
23 symptomatic behaviors were a result of the trauma or
24 abuse or not.  I mean I think that that's part of the
25 issue that's being raised in our field, or one of the

Page 55

1  issues being raised in our field and across the
2  research right now is that it's very hard to tease
3  apart those variables in individuals with autism.  So
4  it's hard for me as a behavior analyst to say I
5  treated behavior specifically as a result of abuse,
6  neglect, trauma, when there are a variety of other
7  issues that are typically involved with those
8  students.
9     So, you know, I have worked with
10 individuals who have been diagnosed with ASD who have
11 also experienced trauma, neglect, and abuse, and my
12 focus has been making their lives happier and more
13 independent.
14 Q.   Have you trained people on how to assess
15 trauma in ASD patients who suffer from abuse?
16 A.   Not specifically.  I have trained people
17 to research backgrounds that include any family
18 histories of abuse.  I've trained people to be
19 thorough behavior analysts regarding behavioral
20 histories, family histories, things of that nature.
21 Q.   Have you been educated or trained to
22 recognize the signs of abuse in children with ASD?
23 A.   I don't know that I've been specifically
24 trained for that.  Certainly over the course of my
25 career I have become very aware of the typical red

Page 56

1  flags and indicators.
2  Q.   In the past ten years have you evaluated
3  or treated children with ASD who were victims of
4  abuse?
5  A.   Who were victims of abuse?  Yes, I
6  believe so.
7  Q.   In the past ten years have you treated
8  children with ASD for trauma?
9  A.   As defined by -- yes.  I mean I think
10 there's varying definitions of trauma and abuse.  I
11 mean I think if we go to research on trauma, I think
12 one of the articles that was brought up in this matter
13 found a definition of trauma being that it was, you
14 know, sexual abuse, threat of life -- I'm
15 paraphrasing -- I mean significant, significant events
16 of trauma.  I don't know that the experiences that
17 I've had with individuals who experienced abuse met
18 that category or that definition of trauma.
19 Q.   Do you consider yourself an expert in
20 evaluating the effects of abuse in children with ASD?
21 A.   I consider myself an expert on autism
22 spectrum disorders.  I consider myself an expert
23 behavior analyst.  And part of being an expert
24 behavior analyst is the recognition of variables that
25 contribute to behavior.  But I would not put myself

Page 57

1  out as an expert on abuse.
2  Q.  Okay.  All right, let's go back to your
3  report.  I think you answered some of these questions
4  earlier.  In addition to all the materials identified
5  in the report, you also reviewed the three articles
6  identified by Dr. Mueller; correct?
7  A.  I did.
8  Q.  And so along with the articles identified
9  by Dr. Mueller, this report identifies all the
10  materials you were provided; right?
11  A.  Yes.  The report contains all the
12  information, and obviously the report does not contain
13  the information of my review of those articles.
14  Q.  Okay.  And the information -- all of the
15  materials that you identify as being provided, and
16  this is in section 4 on page 5, did you review all of
17  the materials you identified prior to issuing your
18  opinions?
19  A.  Yes, to varying degrees.  I mean there
20  was some that I read very thoroughly multiple times,
21  and there was some that I skimmed through.
22  Q.  And I think you identified like some of
23  the depositions you reviewed portions; correct?
24  A.  That's correct.
25  Q.  When you say portions, were you provided

Page 58

1  only portions of the deposition, or did you review
2  only portions of the deposition?
3  A.  I reviewed.  I was provided the full
4  deposition, but I didn't -- I was able to scan through
5  and, you know, within those depositions people were
6  asked if they had family members who lived in certain
7  counties, and I didn't need to spend time on that.
8  Q.  Understood.  How much time would you
9  estimate you spent reviewing all of the materials that
10  you were provided?
11  A.  Gosh, I'm not sure at this point.  I
12  would say probably upwards of 10, 15 hours, 10 hours
13  maybe.
14  Q.  How much were you charging for the
15  review?
16  A.  I believe it was 300 an hour for that
17  review.
18  Q.  Okay, and I think that you identified
19  your hourly rate in this report.
20  A.  I did, it's a footnote, that was what I
21  was just referring to.
22  Q.  On page 1.  So you charged the attorneys
23  $300 an hour for consultation, document analysis, and
24  report preparation; correct?
25  A.  That's correct.

Page 59

1  Q.  And have you billed the attorneys for the
2  time spent up to the creation, or including the
3  creation of the report?
4  A.  I have through October.
5  Q.  Through October, and so that's the period
6  of time after you completed the report?
7  A.  We bill on a monthly cycle, and so that's
8  why my work through the month of October has been
9  delivered to Parker Poe.
10  Q.  Can you estimate -- and I'm not looking
11  for an exact number -- in total how much you've billed
12  so far for your work on this case?
13  A.  Gosh, I mean it's somewhere, 10, 15 hours
14  maybe.
15  Q.  10, 15 hours total for review and
16  creation of the report?
17  A.  I believe so.  I could be off on that,
18  I'm not totally positive.
19  Q.  Okay.  You stated, and I think I asked
20  this earlier, that after producing this report you
21  were provided those three articles.  Those three
22  articles you reviewed, they didn't alter or change any
23  of the opinions that you rendered in your report, did
24  they?
25  A.  They did not.

Page 60

1  Q.  Other than the opinions that you've
2  identified and said this is a complete report of the
3  opinions you expect to render in this case, have you
4  been asked to render any additional opinions?
5  A.  No.
6  Q.  Have you read the deposition of
7  Dr. Mueller?
8  A.  I have not.
9  Q.  Have you been provided any summaries of
10  his deposition testimony?
11  A.  No, just his report.
12  Q.  Okay.  Have you spent time with your
13  attorneys preparing for today's deposition?
14  A.  I did.
15  Q.  How much time would you estimate?
16  A.  Probably an hour.
17  Q.  Have you spoken with anyone else in
18  preparation for today's deposition?
19  A.  I have not.
20  Q.  Okay.  Separate from the time you spent
21  with the attorneys, how much additional time have you
22  spent preparing to give your testimony today?
23  A.  Today, probably two or three hours.
24  Q.  Separate from speaking with your
25  attorneys, what did you do to prepare for today, how

D.D.T. v.                                                                C. Baker Wright, Ph.D.
Rockdale County School District, et al.                                  November 15, 2022

Page 61

1  did you spend those two to three hours?
2  A.   I reread some of the depositions, I
3  reread Dr. Mueller's report, I reread my report, did a
4  review of the timelines and people's names just to
5  refresh my memory of some of that.
6  Q.   Other than the materials that you've
7  identified in your report and the three additional
8  articles, did you refer to or review any other
9  materials?
10 A.   I don't believe so.
11 Q.   Did you say I don't believe so?
12 A.   I don't believe so.
13 Q.   In preparation for today, did you consult
14 any treatises or any other literature other than what
15 you've already identified?
16 A.   Not than what I've already identified.
17 Q.   In preparation for today did you conduct
18 any independent research?
19 A.   Independent research?  No.
20 Q.   When forming the opinions contained in
21 the report, did you consult any treatises or other
22 literature?
23 A.   None that I haven't already mentioned.
24 Q.   When forming the opinions contained in
25 the report, did you conduct any independent research?

Page 62

1  A.   None that I haven't already mentioned.
2  Q.   In preparing your report did you consult
3  with anyone other than the attorneys in this case?
4  A.   No.
5  Q.   In preparing for today, have you
6  consulted with anyone other than the attorneys in this
7  case?
8  A.   No.
9  Q.   Is it fair to say that your opinions are
10 derived through your review of the materials provided
11 and your training and experience?
12 A.   That's correct.
13 Q.   You state in your opinion, or in your
14 report -- I think this is on page 3 -- that you are
15 not in a place to determine whether or not any abuse
16 took place.  Is that accurate?
17 A.   Yes.
18 Q.   Can you tell me what you mean by that?
19 A.   I'm not an investigator, I'm not an abuse
20 investigator.  I would -- I'm asking different
21 questions as a behavior analyst.  Those aren't the
22 questions that I was asked to give opinions on.
23 Q.   What do you mean, those aren't the
24 questions you were asked to give opinions on?
25 A.   I wasn't asked to determine whether or

Page 63

1  not abuse occurred.
2  Q.   Okay.  Do the opinions that you are
3  rendering take into account or consider at all the
4  allegations of abuse?
5  A.   Sure, yes.
6  Q.   What is your understanding of the abuse
7  allegations in this classroom?
8  A.   My understanding is that the teacher,
9  Ms. Pollard, and the paraprofessional, Mr. Lesesne,
10 allegedly engaged in a variety of interactions with
11 D█████ and other students that were described as
12 abuse.
13 Q.   Okay, I'm going to list a couple of the
14 allegations from various sources, and you can just let
15 me know if you understand that these allegations have
16 been made.  Snapping rubber bands?
17 A.   I'm aware of that.
18 Q.   Throwing shoes?
19 A.   I'm aware of that.
20 Q.   Throwing water?
21 A.   Yes.
22 Q.   Hitting with a fly swatter?
23 A.   Yes.
24 Q.   Threatening to hit with an object?
25 A.   Yes, I'm aware that that's an allegation.

Page 64

1  Q.   Name-calling?
2  A.   Yes.
3  Q.   Cursing?
4  A.   Yes.
5  Q.   Speaking in a threatening manner?
6  A.   Yes.
7  Q.   Failing to intervene in escalating
8  instances of physical violence between D█████ and
9  another student?
10 A.   I don't know that I'm aware of that
11 specifically.
12 Q.   Okay.  You saw the video?
13 A.   I did.
14 Q.   Okay.  Anything else that you're aware
15 of?
16 A.   No, I think those are the allegations
17 that I've reviewed.
18 Q.   Okay.  And so we may refer to those as
19 the incidents, and I know that you're talking about
20 alleged abuse, but we can have an understanding for
21 this deposition that generally speaking those are the
22 acts that we are alleging, or identifying?
23 A.   That's correct.
24 Q.   Okay.  And my understanding is that you
25 are not planning on providing an opinion as to whether

Page 65

1  any of these acts do or do not constitute abuse;
2  right?
3  A.  I am not providing an opinion on that.
4  Q.  And you are not going to provide any
5  opinions as to whether or not any of these acts
6  constitute corporal punishment?
7  A.  No, I'm not providing an opinion on that.
8  Q.  And you're not providing an opinion as to
9  whether any of these acts do or do not constitute
10  violations of Rockdale school district policies?
11  A.  I am not, I'm not familiar with those
12  policies.
13  Q.  For purposes of the opinions you're
14  rendering in this case, do you assume that the alleged
15  acts of abuse occurred or did not occur?
16  A.  I'm really not assuming either.  I'm
17  looking specifically at D████'s cognitive and
18  behavioral history and looking at behaviors over time.
19  So I'm really not -- I'm not assuming that it
20  happened, I'm not assuming that it's not.
21  Q.  Okay, and that was my next question.  For
22  purposes of your opinions, are you assuming that the
23  abuse occurred or that the abuse didn't occur?  And I
24  think you're saying neither?
25  A.  Neither.

Page 66

1  Q.  How do the allegations of abuse fit into
2  your opinions?
3      MR. DANIEL: Object to form.
4      Doctor, you can answer unless I instruct
5  you not to.
6      THE WITNESS: Okay.
7  A.  You know, I am considering them as
8  possibilities, that those interactions, that group of
9  interactions between the teacher and the student and
10  the paraprofessional, I'm assuming that, you know, it
11  could have happened.  And the degree to which those
12  interactions took place may also vary.
13      So in looking at D████'s behavior, the
14  characteristics of his autism, you know, I'm
15  accounting for the timeline as it relates to the
16  alleged events because as part of my analysis, I have
17  to take a look at the timeline, the alleged timeline
18  of the events and to see are there other things around
19  that period of time that were also going on.
20      And so, you know, whether I'm not going
21  to -- I don't have an opinion on whether or not they
22  occurred, it certainly entered into my analysis that
23  if it were to have occurred, you know, what else would
24  be important to explore.
25      BY MR. FRIED:

Page 67

1  Q.  So the abuse allegations you're saying
2  are one variable that possibly could have affected the
3  behavior changes we're talking about?
4  A.  It is possible.
5  Q.  And it's just like all the other
6  variables that possibly could have affected the
7  behavior changes?
8  A.  If they occurred, they certainly, you
9  know, could have affected his behavior.
10  Q.  But you're not providing an opinion as to
11  whether or not they occurred; right?
12  A.  I'm not.
13  Q.  And are you offering any opinions as to
14  whether any alleged act in isolation resulted in any
15  type of injury to D████?
16  A.  I'm not, I have no opinion on that.
17  Q.  Are you offering an opinion as to whether
18  the acts alleged as a whole resulted in any type of
19  injury to D████?
20  A.  I can't do that, no.
21  Q.  Are you offering opinions as to whether
22  the alleged acts of abuse could result in injury?
23  A.  Not really.  I mean I'm assessing all the
24  different variables that are founded and, you know,
25  there certainly are several factors that we have

Page 68

1  really good evidence of, and there are other factors
2  that we don't have great evidence of.  And I mean I
3  think the alleged abuse is part of the latter, is
4  that, you know, there are things that people have
5  described as being a part of the classroom and those,
6  you know, as part of what my job was is, you know, to
7  look at is there evidence of that, what the other
8  evidence could be, you know, let's have a bigger
9  understanding about D████'s behavior, his behavior
10  changes, and the factors that could affect that
11  behavior over time.
12  Q.  Yeah, what I'm getting at is at the trial
13  of the case, do you expect to be asked, hey, given all
14  of these alleged acts of abuse, do you have an opinion
15  as to whether that did or did not cause injury to
16  D████?
17  A.  I would not be able to determine that.
18  Q.  All right, I'm going to go to your
19  summary of findings beginning on page 3, and I think
20  you identify eight specific findings in your report.
21  And I'm going to go through each of them, but let me
22  just understand a little bit what you did.  In section
23  3 you do your summary of findings and you have eight
24  summaries; correct?
25  A.  Yes.

Case 1:20-cv-04666-VMC    Document 108-2    Filed 01/17/23    Page 10 of 26

D.D.T. v.                                                    C. Baker Wright, Ph.D.
Rockdale County School District, et al.                      November 15, 2022

Page 69

1  Q.  And then in section 4 you have the items
2  reviewed for purposes of assessment?
3  A.  Yes.
4  Q.  And in section 5 is the relevant
5  education score information.  In section 5 my read of
6  this is this is your summary of the educational
7  records and school information that you're using to
8  support some of your findings.  Is that accurate?
9  A.  School and medical.  I mean I think
10  generally the way I set this report up was sort of in
11  a backwards fashion to give the, you know, sort of the
12  bullet list opinions up front and then the supporting
13  evidence behind that.  I think when I do it in the
14  opposite way, sometimes all the details get confusing,
15  so I'd rather just give the summary up front and then
16  here's why I came to those conclusions.  In section 5,
17  relevant education school information, that is school.
18  And then following that is going to be section 6,
19  medical and other information, so yes.
20  Q.  And what I'm getting at is I'm finding
21  that opinions 1 through 8 constitute, you know, sort
22  of what you've been hired and what you're prepared to
23  opine to.  And then in section 5 and 6, I'm not really
24  seeing additional opinions, I'm seeing records that
25  you've reviewed and said okay -- easy example --

Page 70

1  medical, he was prescribed a medication, that's why
2  I'm saying medication might be a factor to consider.
3  Is that a fair description?
4  A.  I think that's fair, yes.  I mean it's
5  supporting evidence for the summaries that I made in
6  the previous pages.
7  Q.  Okay, and so just housekeeping purposes,
8  I'm going to go through these opinions, and I may say,
9  oh, in addition to this variable, it looks like on
10  page 9, you identified another variable.  And I may
11  ask you is that really just an example, or are you
12  putting this in part of your opinions, just so we're
13  clear; okay?
14  A.  Okay.
15  Q.  And then I see a section where you're
16  taking a look at Dr. Mueller's report, and that's
17  section 7.  But tell me if I'm wrong.  This section 7
18  is really sort of an explanation or your support for
19  your opinions number 7 and 8; is that correct?
20  A.  That's correct.
21  Q.  All right, and then we've got a summary,
22  which again attempts to sort of put -- there's no new
23  opinions in this summary; is that accurate?
24  A.  That's accurate.
25  Q.  It's just sort of putting them in a

Page 71

1  couple succinct paragraphs; is that accurate?
2  A.  Yes, I mean if we think about the report
3  as a diamond shape, you know, we're going specific and
4  then supporting and then back to -- well, I mean I
5  guess it would be a pyramid, sort of bigger picture
6  findings, yeah.
7  Q.  Sure.  All right, so why don't we take a
8  look at opinion number 1.  Opinion number 1 seems kind
9  of general.  You say there are several factors that
10  could have caused or contributed to D█████'s behavior;
11  okay?  You refer to behavior and behavior changes in
12  this report.  So let's go through first what your
13  understanding of, so we can both have an
14  understanding, of the behavioral changes that we're
15  talking about.  We've got weight loss; right?
16  A.  Yes, when I -- I sort of use the words
17  behavior and behavior change interchangeably.  You
18  know, behavior change could be increase, decrease over
19  time.  So I can clarify that more specifically as we
20  go throughout this.  So just a point of clarification,
21  that I may use behavior and behavioral change
22  interchangeably.
23  Q.  Okay, and I just want to get, again, like
24  we did with the allegations of abuse, there are
25  allegations of behavior changes here that Plaintiffs

Page 72

1  are alleging resulted from the abuse.  And so I kind
2  of want to put that in a box.  And if you want to be
3  more specific later on, we can, but I want to try to
4  come to some sort of understanding.  What we are
5  looking at in this case from the plaintiff's
6  perspective and what we might be referring to as
7  behavioral changes is we've got weight loss; right?
8  A.  Yes.
9  Q.  And we've got not eating; right?
10  A.  Specifics of not eating, I mean when they
11  spoke about -- how about changes in eating patterns.
12  Q.  That's fine.  Increased aggression?
13  A.  Aggression.
14  Q.  Okay.  Regressive behavior in terms of
15  wetting himself at home and toileting?
16  A.  That was in there, yes.
17  Q.  Fear of going to school?
18  A.  That was in there about fear of getting
19  on the bus, fear of getting on the bus specifically I
20  think I recall.
21  Q.  Increased crying?
22  A.  Crying, yes.
23  Q.  Anything else that you're aware of?
24  A.  No, no.
25  Q.  Okay.  And there might be --

D.D.T. v.
Rockdale County School District, et al.

C. Baker Wright, Ph.D.
November 15, 2022

Page 73

1  A.   Behavioral concerns over the course of
2  his life obviously with the deficits associated with
3  autism and other deficits, but I think that those are
4  the ones that --
5  Q.   Primarily, yeah, generally speaking.
6  There might be more, but I just want to make sure,
7  that unless we're talking about something specific,
8  like we'll talk about weight loss or weight gain, when
9  we refer to the behavior changes or when you're
10  referring to behavior or behavioral changes, these are
11  essentially the things we're talking about; right?
12  A.   Right, yes, that's correct.  And the
13  reason why I use that interchangeably -- well, there
14  are several reasons I use it interchangeably.  In this
15  particular case some of the allegations were of
16  behavior change.  And some of the evidence that I saw
17  was that those behaviors have existed and have been
18  because of a variety of reasons, that those behaviors
19  have been in existence before, during, and after.  And
20  so there's differences of opinion in terms of whether
21  those were increased and decreased.  So that's another
22  reason why I'm sort of hesitating and clarifying that.
23  Q.   Yeah, and I think that in your report
24  we'll get to it.  You're talking about, for example,
25  aggressive behavior.  The fact that he has been

Page 74

1  documented to have aggressive behavior prior to this
2  period of time is another variable that we could look
3  at or that we should look at; right?
4  A.   It certainly is.
5  Q.   All right.  You state in this section of
6  your report that because the alleged acts of abuse are
7  in dispute, further assessment of behavior changes and
8  other variables as necessary.  Tell me what you mean
9  by that.
10  A.   I mean exactly what I say there.  My only
11  understanding of the alleged abuse is that it's in
12  dispute and that that's part of, that's part of the
13  questions.  And so it's exactly what I mention there.
14  Q.   Because it's in dispute, we want to look
15  at other variables that may have caused or contributed
16  to the behavior changes?
17  A.   I wouldn't say because it's in dispute.
18  I think we want to look at all the different
19  behavioral variables, regardless, as we're looking
20  from a clinical standpoint, whether it's in dispute or
21  not.  You know, obviously I thought it was important
22  to note that that's part of the variability here.
23  Q.   Okay.
24  A.   But I would do that assessment.  I would
25  look for these other variables even if it wasn't in

Page 75

1  dispute.
2  Q.   Okay, and I think that's your second
3  opinion, so let me just ask you this.  If the
4  allegations were not disputed, further assessment of
5  behavior changes and other variables would still be
6  necessary in your opinion; correct?
7  A.   That's correct.
8  Q.   Okay.  You're saying that this is not to
9  say the abuse occurred or did not, that's what we
10  spoke about earlier, right, you're not saying it did
11  or did not occur?
12  A.   That's right.
13  Q.   It's another variable in there?
14  A.   It's another potential variable, yes.
15  Q.   Okay.  In this opinion number 1, you're
16  not concluding that the behavior changes were not the
17  result of abuse; right?
18  A.   I am not -- sorry, I'm trying to fix the
19  double negative.
20  Q.   Let me fix the double negative; okay?
21  Are you concluding that the behavior changes were not
22  the result of abuse?
23  A.   I am not concluding that.
24  Q.   Right.  Are you able to rule out abuse as
25  the cause of behavior changes?

Page 76

1  A.   I'm not.
2  Q.   And I'll ask this over and over again
3  just for the record.
4  A.   Sure.
5  Q.   Are you able to rule out abuse as a
6  contributing cause of the behavior changes?
7  A.   I'm not.
8  Q.   If the allegations of abuse were not
9  disputed, would you be able to conclude that the abuse
10  was a cause or contributing factor to behavior
11  changes?
12  A.   No.
13  Q.   When you say evaluation of other
14  variables as necessary, are these variables that we're
15  talking about all addressed in your other opinions?
16  A.   There may be other variables involved,
17  but the ones that I've reviewed are included in my
18  report.
19  Q.   Okay, so we can rely on the variables you
20  identify in your report as the variables that you plan
21  to testify about; correct?
22  A.   That's correct.
23  Q.   Okay.  Let's go to opinion number 2.  You
24  state that there is evidence of several other relevant
25  changes and factors which could have also contributed

Page 77

1   to or explained behavior change, making it nearly
2   impossible to suggest any behavior changes were due to
3   only one of the variables, even if the alleged abuse
4   were to have occurred.  Again, the relevant changes
5   that you're talking to, are these changes that are
6   being discussed in your remaining opinions, 3 through
7   8?
8   A.  Yes.
9   Q.  Okay.  And the factors which could have
10  contributed to or explained the behavior changes, are
11  these factors also discussed in your remaining
12  opinions 3 through 8?
13  A.  Yes.
14  Q.  Okay.  Are there any changes or factors
15  that you are referring to or relying upon here in
16  opinion number 2 that are not discussed in opinions 3
17  through 8?
18  A.  No.
19  Q.  Okay.  And again, in opinion number 2,
20  are you concluding that the behavior changes were not
21  the result of abuse?
22  A.  I'm not concluding that.
23  Q.  In this opinion number 2, are you able to
24  rule out abuse as the cause of the behavior changes?
25  A.  I'm not.

Page 78

1   Q.  In this opinion number 2, are you able to
2   rule out abuse as a contributing cause of the behavior
3   changes?
4   A.  I'm not able to rule it out.
5   Q.  Are you saying that even assuming the
6   abuse was undisputed, you would not be able to opine
7   that the behavior changes we are alleging in this case
8   have occurred as a result of the abuse?
9   A.  Not solely.
10  Q.  Okay.  Even if the abuse was undisputed,
11  you would not be able to rule out abuse as a cause or
12  contributing factor to the abuse, or to the behavior
13  changes; is that accurate?
14  A.  That's accurate.
15  Q.  And based upon your review of the records
16  provided, I think this is what you're saying in number
17  2, that you cannot opine as to the cause of the
18  behavior changes; right?
19  A.  Not specifically.  It's very difficult,
20  as I mentioned in the report, to tease out the
21  equation, for lack of a better descriptor, of what
22  contributed to the behavior change that was alleged.
23  Q.  In this opinion number 2, you're saying
24  that other relevant changes could have caused the
25  behavior changes; right?

Page 79

1   A.  That's correct.
2   Q.  Other relevant changes could have
3   contributed to the behavior changes; right?
4   A.  Could have.
5   Q.  Other factors could have caused or
6   contributed to the behavioral changes; right?
7   A.  Yes.
8   Q.  Other variables could have caused or
9   contributed to the behavior changes; right?
10  A.  Yes.
11  Q.  So all of these changes, factors, and
12  variables are possibilities that could have caused or
13  contributed to the behavior changes; is that accurate?
14  A.  Yes, that's accurate.
15  Q.  Okay, let's go to opinion number 3.  And
16  I think what you're saying -- and we'll get into it,
17  and I'm going to give you an opportunity to talk about
18  it -- but I think what you're saying is that issues
19  related to D███'s gastrointestinal health, separate
20  from the abuse allegations, issues related to D███'s
21  gastrointestinal health could have contributed to his
22  weight loss; is that accurate?
23  A.  Yes, that's accurate.
24  Q.  Okay.  You're not a medical doctor;
25  right?

Page 80

1   A.  No, no.
2   Q.  I expect to hear that kind of response
3   when people say you're not a lawyer; right?
4   A.  I would say that too.
5   Q.  You don't treat patients for
6   gastrointestinal issues, do you?
7   A.  I do not.
8   Q.  You do not prescribe medication to
9   patients with GI issues, do you?
10  A.  I don't.
11  Q.  Do you have any experience evaluating the
12  effects of prescribed medication on weight loss?
13  A.  No.
14  Q.  How much weight did D███ lose between
15  September and December, do you know?
16  A.  I don't remember specifically.  It may be
17  in this report.  I don't have in my notes specifically
18  how much weight he lost.  I believe it was more than
19  20 pounds.  He was down to 71 pounds in 2019.  I don't
20  have that specific number.
21  Q.  Do you recall in forming your opinions
22  whether or not you had at one point an understanding
23  of the amount of weight that he lost?
24  A.  Yes, yes.
25  Q.  Do you know what percentage of his body

D.D.T. v.
C. Baker Wright, Ph.D.
Rockdale County School District, et al.
November 15, 2022

Page 81

1  weight that was?
2  A.  I don't remember.
3  Q.  In forming your opinions, do you believe
4  that you had an understanding of what percentage of
5  the body weight that was?
6  A.  Yes, I do, I read through his medical
7  records from Conyers Pediatrics as well as the gastro
8  doctor that confirmed that weight loss.
9  Q.  Did you consider the amount of weight
10  that he lost in those few months dramatic or severe?
11  A.  You know, it seems dramatic to me, but
12  that's not my area of expertise.
13  Q.  You reviewed his charts, though, that
14  identified his weight fluctuations over the years;
15  right?
16  A.  Yes.
17  Q.  Are you concluding that the medications
18  that he was prescribed were the cause of the weight
19  loss?
20  A.  No.
21  Q.  Are you saying the medication possibly
22  could have been a cause of the weight loss?
23  A.  I'm saying that the medication and the
24  condition that the medication was prescribed for
25  should be looked at in a thorough analysis of his

Page 82

1  behavior --
2  Q.  Yeah, and I think --
3  A.  -- related to weight loss.  I mean the
4  ZENPEP, which we may get to, was a medication that was
5  prescribed that is typically prescribed for exocrine
6  pancreatic insufficiency, which I've learned a bit
7  about -- again, not a medical doctor -- but I've
8  learned a bit about in looking through some
9  information on that.
10      And that is tied to his gastro health and
11  is also tied to weight loss.  So I'm just bringing
12  them up as a non-gastro doctor as things that he
13  was -- medicines that he was prescribed for conditions
14  for which he was diagnosed that also have some bearing
15  on weight loss.
16  Q.  Yeah, I understand that, and I think that
17  we'll break it up because I think later on in your
18  opinions you sort of say -- and I think this may have
19  been sort of tucked into your report -- you talk about
20  how on one hand medication can cause weight loss, but
21  also medication can result in appetite suppression
22  that can cause weight loss or medication can result in
23  increased or decreased aggression, right, you know,
24  things like that.  So I'll give you an opportunity.  I
25  just want to specifically understand if you are

Page 83

1  opining that the medication possibly could have been a
2  cause of the weight loss.
3  A.  It could possibly have been a
4  contributor, possibly.
5  Q.  Are you concluding that his GI issues
6  caused the weight loss?
7  A.  I think it is a variable that needs to be
8  explored when looking at weight loss.
9  Q.  Understood, but are you concluding or
10  opining that the GI issues caused the weight loss?
11  A.  No.  It could have been a contributing
12  factor but not caused it.
13  Q.  And that's what I'm saying.  You're
14  opining that his GI issues could have possibly been a
15  contributing factor to his weight loss?
16  A.  I think it's a relevant piece of the
17  puzzle.
18  Q.  Are you saying that it's a possibility or
19  a strong possibility that the GI issues resulted in
20  weight loss, or are you just saying it needs to be
21  looked at as a part of the puzzle?
22  A.  I'm saying it needs to be looked at as
23  part of the puzzle.
24  Q.  So you don't have any opinion as to how
25  strong of a possibility it is that the GI issues

Page 84

1  caused the weight loss?
2  A.  I don't.  It seems to me based on the
3  evidence that I have and the timeline of those things
4  that it definitely needs to be included in the
5  conversation of what contributed to his weight loss
6  and other behavior changes that were going on at the
7  time.
8  Q.  Are you planning on opining that dietary
9  changes resulted in the weight loss?
10  A.  I think that changes in diet, the ones
11  that were identified and the ones that I read, there
12  was evidence that there was some difference in diet
13  changes which I think also should be a part of the
14  puzzle in determining what the contributing factors
15  were for weight loss.
16  Q.  I understand.  And just to be clear, what
17  I'm asking, I'm asking if you're concluding that the
18  dietary changes resulted in weight loss.  And I'll ask
19  a second question for the record.  Are you saying that
20  they should be looked at or a part of -- so I want to
21  know if you're actually opining, are you going to
22  opine that the dietary changes were the cause of the
23  weight loss?
24  A.  I'm not saying that they're a cause, no.
25  Q.  Are you saying that the dietary changes

Case 1:20-cv-04666-VMC    Document 108-2    Filed 01/17/23    Page 14 of 26
D.D.T. v.
Rockdale County School District, et al.
C. Baker Wright, Ph.D.
November 15, 2022

Page 85

1  could possibly have caused or contributed to the
2  weight loss?
3  A.  Yes.
4  Q.  Okay.  Here is an instance.  If we go to
5  page 8, you reference pancreatic insufficiency.
6  A.  Yes.
7  Q.  Are you opining that pancreatic
8  insufficiency caused or contributed to D████'s weight
9  loss or gain?
10  A.  Not solely, no.
11  Q.  Are you saying that the records indicate,
12  is he diagnosed with pancreatic insufficiency?
13  A.  There are medical records that suggest
14  that, yes.
15  Q.  Okay, are you diagnosing him with
16  pancreatic insufficiency?
17  A.  No.  No, no, no.
18  Q.  Okay.  And you're not opining that the
19  pancreatic insufficiency caused the weight loss;
20  right?
21  A.  No.  Again, it's a piece of the puzzle.
22  Q.  You're opining that pancreatic
23  insufficiency possibly could have caused weight
24  changes; correct?
25  A.  Possibly.

Page 86

1  Q.  Okay.  On page 9, and I think this is
2  what we were talking about earlier, you start
3  discussing appetite suppression or enhancement.  And
4  correct me if I'm wrong, but are you opining that
5  appetite suppression or enhancement as the result of
6  the medications possibly could have caused or
7  contributed to D████'s weight loss?
8  A.  Again, it's a possible factor.
9  Q.  Yeah, and what I'm getting at is I think
10  when you're identifying appetite suppression or
11  enhancement, you're talking about appetite suppression
12  or enhancement relative to the medications, right, the
13  medication might have had the effect of appetite
14  suppression or enhancement that could have possibly
15  led to weight loss, is that what you're opining?
16  A.  Yes.
17  Q.  Okay.  We're not talking about appetite
18  suppression or enhancement related to any other
19  variable other than the medications?
20  A.  Yes, just what's -- yes, what is written
21  there about the medications and the effects of his
22  medications.
23  Q.  And do you have knowledge of what
24  medications result in appetite suppression?
25  A.  For this I was referring to notes on

Page 87

1  doctors' reports that tied -- I believe that tied a
2  specific medication to appetite suppression or
3  appetite enhancement.  So the physician, just for
4  example -- and I'm not quoting -- the physician may
5  have said we're going to change from medication A to
6  medication B because of the potential appetite
7  suppression of medicine A.  So that's where I'm
8  drawing those conclusions from.  I'm not an expert on
9  those medicines, I'm just -- I'm connecting the dots
10  from the doctors' reports.
11  Q.  And you're not saying that the medication
12  did cause appetite suppression; right?
13  A.  No, I'm just reporting what the doctor
14  said.
15  Q.  And you're not saying that the appetite
16  suppression caused the weight loss; right?
17  A.  Not solely.  Again, these are just pieces
18  of the puzzle that need to be explored.
19  Q.  Okay.  So you don't really have an
20  opinion one way or the other as to whether the
21  medications caused or contributed to the weight loss;
22  right?
23  A.  No.
24  Q.  You're just saying that they might have?
25  A.  Yeah, the evidence that I'm producing is

Page 88

1  that the medical records indicate that those medicines
2  could have either effect, and certainly the amount of
3  food that one eats is directly tied to the amount of
4  weight that one would gain or lose.
5  Q.  Okay.  Are you able to point to any
6  medical records that indicate that the medications
7  cause appetite suppression?
8  A.  I think in the example that I just
9  provided to you, I think that there were -- I believe
10  there were doctors' notes that said we moved from
11  medicine A to medicine B because of the appetite
12  suppression effects of medicine A or vice versa.
13  That's what I was referring to.  I don't have those
14  things specifically quoted in here.
15  Q.  You discuss agitation, reduction, or
16  intensification in this same section.  And I just want
17  to understand.  You're also talking about how
18  medications might affect agitation, reduction, or
19  intensification; correct?
20  A.  It could, yes.
21  Q.  Are you opining that D████'s agitation
22  levels could have possibly been intensified as a
23  result of the medications?
24  A.  It could have based on the information
25  that the physicians and the parent reported.

D.D.T. v.
Rockdale County School District, et al.

C. Baker Wright, Ph.D.
November 15, 2022

Page 89

1  Q.  Do you have an opinion as to whether his
2  agitation levels were intensified as the result of
3  medications?
4  A.  No.
5  Q.  Also on page 9 of the report, you ask --
6  this might be just as an example -- what if D█████ has
7  a medical condition that limited the absorption of
8  valuable foods he eats.  What if he is very limited in
9  the foods he prefers which cause other GI distress
10  problems or problems with increasingly high
11  cholesterol levels.  These are not exaggerated
12  examples but likely scenarios.  Do you see where that
13  is stated on page 9?
14  A.  I remember reading that earlier this
15  morning, but I can't find it as I'm scanning through
16  the document.  Can you give me where it is?
17  Q.  You would have thought that I would have
18  highlighted it if I was going to ask you questions
19  about that.
20  A.  Is that on page 9?
21  Q.  Oh, wait a minute.  No, it's on page 10.
22  A.  Okay.
23  Q.  It's the end of the first -- or middle of
24  the first not full paragraph, first section, however,
25  what if D.D.T. has a medical condition.  Do you see

Page 90

1  that?
2  A.  I see that now, thank you.
3  Q.  Okay.  And really I just want to know are
4  you aware of any medical records or other evidence
5  that suggest D█████ has a medical condition that
6  limits the absorption of nutrients?
7  A.  Only those that I saw in the records.
8  Q.  What records indicate that he has a
9  medical condition that limits the absorption of
10  nutrients?
11  A.  Well, there was -- let me get to that.
12  So he was -- there were medical records that referred
13  to pancreatic insufficiency, and specifically exocrine
14  pancreatic insufficiency, where the pancreas doesn't
15  make enough enzymes to break the food down.  That was
16  noted in one of the Marcus Autism Center's psychiatric
17  reports in March of 2019.  There was also a medication
18  early on where he was prescribed with -- and I'm going
19  to abuse this -- metoclopramide.  That was I think
20  specifically -- that was earlier.
21       That was a medication that, quote,
22  unquote, speeds up the rate at which the stomach
23  empties into the intestines.  There's a Marcus Center
24  report in April of 2019 that was a follow-up from an
25  abdominal ultrasound due to abnormal pancreatic

Page 91

1  sufficiency.  So there's medication, the ZENPEP, and
2  there's references in several reports to abnormal
3  pancreatic sufficiency.
4  Q.  And is that why you're drawing the
5  conclusion that he has a medical condition that limits
6  absorption of nutrients?
7  A.  I drew that specifically from some
8  report, and I can't remember exactly where that is.
9  Q.  Okay, are you opining or concluding that
10  D█████ has a condition that limits the absorption of
11  nutrients?
12  A.  I'm referring to physicians' reports and
13  Marcus Autism Center reports that review those
14  symptoms, or those characteristics.
15  Q.  What I'm trying to get at is why do you
16  say these are not exaggerated examples but likely
17  scenarios?  You don't say that he's been diagnosed
18  with these issues.  You're saying these are likely
19  scenarios.  What do you mean by that?
20  A.  They're likely in that there's evidence
21  of those things in the medical reports.
22  Q.  Okay.  Do you have an opinion as to
23  whether this medical condition caused or contributed to the
24  absorption of nutrients caused or contributed to the
25  behavior changes?

Page 92

1  A.  Do I have an opinion about that?
2  Q.  Yeah, are you opining that this medical
3  condition caused or contributed to behavior changes?
4  A.  I think it's part of the puzzle.  We're
5  talking about weight loss and, you know, certainly GI
6  issues and, you know, what the physicians were
7  referring to was the pancreatic insufficiency.  I'm
8  not an expert on those, but those have something to do
9  with his digestion of food, which would include -- I
10  would assume it would include weight loss.  I would
11  also assume it would have something possibly to do
12  with, you know, his eating habits.
13  Q.  Right.  What I'm asking, again, as I did
14  before, are you opining that this medical condition
15  caused the behavior changes?
16  A.  I'm not opining that it caused it, no.
17  Q.  Are you opining that this medical
18  condition that limits the absorption of nutrients
19  possibly could have contributed to the behavior
20  changes?
21  A.  It's possible.
22  Q.  And here we're talking about weight loss;
23  right?
24  A.  Correct.
25  Q.  Are you talking about any of the other

Case 1:20-cv-04666-VMC    Document 108-2    Filed 01/17/23    Page 16 of 26

D.D.T. v.                                                      C. Baker Wright, Ph.D.
Rockdale County School District, et al.                        November 15, 2022

Page 93

1  behavior changes?
2  A.  It may have contributed to some of the
3  food-seeking behaviors that were reported.  Again,
4  that's not a medical opinion, it's a question that I
5  think needs to be asked.  Yeah, it's another piece of
6  the puzzle.
7  Q.  Is it your opinion that D███ was very
8  limited in the foods he ate and that caused GI
9  problems or problems with increased cholesterol?
10 A.  That's not my opinion.  I'm referring to
11 doctors' notes when referring to that.
12 Q.  Okay.  And then is it your opinion that
13 the limited foods he ate which caused GI problems or
14 problems with increased alcohol possibly could have
15 contributed to the behavior changes?
16 A.  You used the word alcohol in there, and I
17 know you did it by mistake.
18 Q.  I meant cholesterol, cholesterol.
19 A.  I do know that we're on the record, and I
20 just want to be sure.
21 Q.  I did say it.
22 A.  Not yet, not yet.  No, I am noting
23 changes in diet could be contributing factors to
24 weight gain or weight loss.
25 Q.  Okay.  But you're not saying any of these

Page 94

1  conditions actually caused the behavior changes;
2  right?
3  A.  Not solely.
4  Q.  Okay.  You're saying that they possibly
5  could have contributed; right?
6  A.  They are possible contributors.
7  Q.  Okay.  In opinion number 3, are you
8  concluding that the weight loss was not the result of
9  abuse?  Same questions as before.
10 A.  I'm not.
11 Q.  Are you able to rule out abuse as the
12 cause of the weight loss?
13 A.  No.
14 Q.  In this opinion number 3, are you able to
15 rule out abuse as a contributing cause of the weight
16 loss?
17 A.  No, I'm not able to rule it out as a
18 contributor.
19 Q.  You can't conclude that the weight loss
20 was caused by abuse; right?
21 A.  I can't.
22 Q.  You can't opine that the weight loss was
23 not caused by abuse; right?
24 A.  I can't.
25 Q.  And you can't opine that the weight loss

Page 95

1  was actually caused by medications; right?
2  A.  I'm sorry, you're --
3  Q.  You can't opine that the weight loss was
4  caused by the medications; right?
5  A.  I can't opine on that.
6  Q.  You can't opine that the weight loss was
7  caused by GI issues or diet changes; right?
8  A.  No, I mean I can -- I have an opinion
9  that it maybe was involved, but not solely, no.
10 Q.  I think what you're saying is that any
11 one of these variables could have caused or
12 contributed to the weight loss; right?
13 A.  That is what I'm saying, yes.
14 Q.  And that includes the abuse; right?
15 A.  That includes all those different
16 factors.
17      MR. DANIEL:  Object to form.
18      BY MR. FRIED:
19 Q.  That includes the abuse; correct?
20      MR. DANIEL:  Object to form.
21 A.  It includes factors that I have reviewed
22 and possible other factors that I have not reviewed.
23 If abuse occurred, then that would also be a likely --
24 or a possible factor.
25      BY MR. FRIED:

Page 96

1  Q.  You said reviewed and not reviewed.  Are
2  there any other variables that you're going to opine
3  possibly could have caused or contributed to the
4  weight loss?
5  A.  No.
6      MR. FRIED:  All right, it's 12:26.  I've
7  got to take a -- my Florida attorneys call this
8  a comfort break.  Is that okay if we take a
9  comfort break?  And we are moving along, and I
10 will definitely be done within the next
11 probably hour; okay?  So why don't we take ten
12 minutes, does that work?
13      MR. DANIEL:  Yeah.
14      (Recess.)
15      BY MR. FRIED:
16 Q.  Dr. Wright, I'm looking at the bottom of
17 page 3 of Exhibit Number 1.  This is your opinion
18 number 4.  You're talking about D███'s seizures.
19 Why don't you tell me what you're opining here in this
20 paragraph?
21 A.  I'm only reporting what I found in his
22 medical records as the emergence of seizure activity,
23 which I believe occurred shortly after, or at least
24 was found shortly after his time in that classroom.  I
25 refer to it later in the section on medical health,

D.D.T. v.
Rockdale County School District, et al.

C. Baker Wright, Ph.D.
November 15, 2022

Page 97

1 just bringing it up as a part of his medical history.
2 Q.  Are you providing any opinions relative
3 to the seizures in this paragraph?
4 A.  Only that they occurred, that there were
5 characteristics of his behavior that matched some of
6 the characteristics that were described as absent
7 seizures, and that, again, it's a part of his medical
8 history that needs to be explored and included in the
9 assessment of his behavior.
10 Q.  Let me ask it this way.  Are you
11 concluding that the seizures caused the behavior
12 changes?
13 A.  No.
14 Q.  Are you opining that the behavior changes
15 caused the seizures?
16 A.  No.
17 Q.  Are you concluding that the seizures
18 could have possibly contributed to the behavior
19 changes?
20 A.  Could have possibly.
21 Q.  Okay.  Are you making any opinions as to
22 the cause of the seizures?
23 A.  No.
24 Q.  Okay.  Do you have training or experience
25 in diagnosing seizures in children with ASD?

Page 98

1 A.  No.
2 Q.  Do you have training or experience
3 treating seizures in children with ASD?
4 A.  No.  Quite a few of our individuals that
5 we serve also have seizure disorders, and so whereas I
6 don't diagnose them, I'm familiar with their effects
7 on behavior.
8 Q.  And so how is it that you're -- tell me
9 how the seizures that begin following the period of
10 time in the classroom correlate in your opinion to the
11 behavior changes that we are alleging in this case as
12 a result of abuse.
13 A.  The information that was available in the
14 records indicated that the grand mal seizures occurred
15 after and certainly his diagnosis of seizures occurred
16 after the time when he was in that classroom.  There
17 was other information, which is why I'm bringing it
18 about as sort of one of these possible contributing
19 factors of his behavioral health is that there were
20 notes throughout the records of him staring off into
21 space, of him being unresponsive.  And I believe that
22 those reports were from various sources.
23     As a part of the exploration of his
24 seizures, the physicians explained that not only is
25 there this likelihood of grand mal seizures, which is

Page 99

1 what we typically think about when we think about
2 seizures, visible shaking and sometimes loss of
3 control, there are absent seizures, which don't
4 include convulsions, don't include shaking; but what
5 they look like is someone spacing out, losing contact,
6 staring off into space.
7     And so my only -- I didn't think that it
8 was too far of a stretch to say that his neurological
9 health that emerged, seemingly diagnostics, after,
10 could have played a role in some of his behavior
11 before because there were behaviors that occurred that
12 were described exactly in the same way that absent
13 seizures are described.
14 Q.  You don't know one way or the other how
15 his neurological condition might have caused or
16 contributed to any of the seizures --
17 A.  No.
18 Q.  -- or behavior changes; is that accurate?
19 A.  That's correct.  You know, our experience
20 with individuals who are verbal and nonverbal who
21 experience seizures, there are oftentimes pretty
22 significant behavioral responses to the presence of
23 those seizures or presence of auras, which occur
24 before seizures.  And so again, just looking at his
25 overall behavioral health, I think it's an important

Page 100

1 factor.  If I were doing an assessment for him
2 clinically, I would not leave that out.
3 Q.  Okay.  And again, when you're looking at
4 the seizures, you're not ruling out abuse or any other
5 of the variables or factors that you're talking about
6 as a cause or contributing cause to behavior changes;
7 right?
8 A.  I am including it as one of the several
9 possible contributing factors.
10 Q.  Okay.  All right, let's go to the next
11 page, page 4, and look at opinion number 5.  You're
12 pointing out that D████'s history of behavior is
13 relevant to the effects of abuse; right?  So I want to
14 try to summarize it.  And you can give me some more
15 flavor on this, but I think what you're saying is that
16 the behavior changes that we're talking about today
17 and that we're alleging were the result of the abuse,
18 you're saying they could have been brought about or
19 explained by looking at historical factors that are
20 discussed in this section, right, the idea that they
21 existed before, or how they existed after?
22 A.  I mean certainly an assessment or an
23 analysis of behavior change would have to include the
24 presence or absence of that behavior before and after
25 time.  And so that's what I'm bringing about in this

D.D.T. v.                                                C. Baker Wright, Ph.D.
Rockdale County School District, et al.                  November 15, 2022

---

Page 101

1  fifth point here is these behaviors didn't emerge for
2  the first time at this period of time.  These are
3  behaviors that have been well-documented over his
4  educational career and that exploration into the
5  history of those behaviors, both as they have
6  increased and decreased in previous years, would be
7  helpful.
8      Again, if I were clinically responsible
9  in this case, I would go back and say okay, well, tell
10 me about the times when his behavior improved before
11 this period of time, tell me about periods of time
12 when those behaviors worsened and what were the
13 contributing factors at those times.  So again, we
14 just sort of tease out what the significant variables
15 and contributing factors may have been.
16 Q.  And you've seen some of that information
17 in the records you reviewed; right?
18 A.  Some, yes.
19 Q.  Yeah.  The factors that we're talking
20 about in this opinion, let me just go through them and
21 tell me if I'm getting them right.  The factors, when
22 you say the result of historical factors, you're
23 talking about his historical difficulty with
24 environmental changes; is that right?
25 A.  That's one of them, yes.

---

Page 102

1  Q.  His historical difficulty interacting
2  with peers?
3  A.  Yes.
4  Q.  His historical difficulty with
5  transitions at home, school, and community?
6  A.  Yes.
7  Q.  His transition to middle school?
8  A.  Transition to middle school as a very big
9  example of a transition.
10 Q.  Okay, transition, okay.  Presence or
11 absence of certain peers?
12 A.  Yes.
13 Q.  Difficulty with transitions in new
14 places?
15 A.  Again, you know, there's been evidence of
16 that, with the middle school transition being an
17 important one.
18 Q.  Difficulty with new teachers?
19 A.  Yes.
20 Q.  Difficulty with adults?
21 A.  Yes.
22 Q.  Difficulty with structure in a classroom?
23 A.  Yeah, I think difficulties in an
24 educational environment, I mean those -- whether you
25 know, not judging one way or the other, but he has had

---

Page 103

1  difficulties behaviorally in classrooms before,
2  during, and after, and those are important.
3  Q.  Yeah, and I'm just pulling these from
4  your report.  Difficulty with structure in the
5  classroom and difficulty with lack of structure in the
6  classroom?
7  A.  Yes.
8  Q.  Okay.  So when we're taking a look at any
9  of these factors, you're saying that there is some
10 historical presence regarding these factors.  And so
11 are you saying that you need to look at something like
12 presence or absence of certain peers during this
13 period of time and how that might have affected his
14 behavior changes?
15 A.  Yes.
16 Q.  Okay.  And so then let me just -- are
17 there any other variables that I haven't mentioned?
18 A.  I would say yes to the peers during this
19 period of time, but also, specifically, one particular
20 peer during this period of time who he has
21 historically had problems with before middle school.
22 I mean I think that that's one of -- that's I think a
23 pretty big part of that classroom environment,
24 obviously other students in the classroom, but there
25 was one particular student that there was a history

---

Page 104

1  with before middle school.
2  Q.  Yeah, and so with the presence of that
3  student or any of these others, you're talking about
4  look, we've got a history of it and now we need to
5  take a look at how that history or how that variable
6  might have affected him during this period of time?
7  A.  That's correct.
8  Q.  Have I identified all the variables or
9  factors you're talking about in this section?
10 A.  I think so.  And, you know, in
11 addition -- I wouldn't say in addition to that -- the
12 compounding factors of those things.  You know, a
13 transition to middle school with a peer with whom he's
14 had problems with, with noise produced by that peer,
15 there's a lot of different -- again, to say the
16 presence or absence of this other peer would be, you
17 know, that would be a clean way to look at it, but
18 it's not that clean.
19 Q.  Yeah, one, some, or all of these factors
20 is what you're kind of looking at; is that fair?
21 A.  That's correct.
22 Q.  Okay.  So I just want to go back to the
23 same questions that I've been asking.  Are you opining
24 that any one of these factors caused the behavior
25 changes?

---

D.D.T. v.
Rockdale County School District, et al.

C. Baker Wright, Ph.D.
November 15, 2022

Page 105

1 A. No.
2 Q. Are you opining that one, some, or all of
3 these factors caused or contributed to the behavior
4 changes?
5 A. No, they --
6 Q. You're saying that one, some, or all --
7       MR. DANIEL: David, I don't think he was
8 finished answering the last question.
9       MR. FRIED: Understood.
10       BY MR. FRIED:
11 Q. You're saying that one, some, or all of
12 these factors possibly could have affected the
13 behavior changes that we're looking at; is that fair
14 to say?
15 A. Yes.
16 Q. But in this opinion number 5, just as we
17 talked about in these other ones, you're not ruling
18 out abuse as a cause or contributing cause of the
19 behavior changes; right?
20 A. I'm not ruling it out or in.
21 Q. All right. And you're not ruling out or
22 in any of these factors; correct?
23 A. I'm simply saying that they are
24 potentially significant to his behavioral health and
25 assessment.

Page 106

1 Q. Okay. On page 9 of the report -- and
2 again, this is going to be repetitive of the weight
3 loss issue -- you talk about the effect of medication
4 on other behaviors, like hyperactivity, aggression,
5 anxiety. Is it your opinion that the medications
6 D███ was prescribed caused or contributed to the
7 behavior changes, or once again, possibly could have
8 caused or contributed to the behavior changes?
9 A. Possibly could have caused or
10 contributed.
11 Q. Okay. But you can't opine one way or the
12 other that they did or did not cause the behavior
13 changes; correct?
14 A. No. I think overall the gist of this is
15 that it is difficult, and much more difficult, in
16 fact, to tease out an individual contributing factor
17 and the weight at which it affected his behavior.
18 Q. And I think that's ultimately where you
19 say in your assessment it's nearly impossible to tease
20 out the specific effects of the alleged abuse from the
21 other likely contributing factors which occurred
22 before; right?
23 A. Right.
24 Q. That's kind of what you're saying now?
25 A. That's the summary of all of this because

Page 107

1 there are meaningful likely contributing factors. I
2 mean, you know, behavior change is not a very simple
3 thing. It involves a lot of different variables. And
4 there are several variables that I've gone through
5 here that are evidenced in the documents that as a
6 clinician I would pay attention to, and those are the
7 ones that I've brought to the attention -- or to our
8 attention in this report.
9 Q. When you say likely, are any one of these
10 variables that we've been discussing more likely than
11 others?
12       MR. DANIEL: Object to form.
13 A. I don't know that I could say that.
14       BY MR. FRIED:
15 Q. All right, let's take a look at opinion
16 number 6. You opine that it's impossible to determine
17 the effects of name-calling or rude, disrespectful,
18 unkind, or abusive language on a student with D███'s
19 level of disability; is that right?
20 A. Yes.
21 Q. Are you concluding that the alleged
22 name-calling and abusive language had no effect on
23 D███s behavior?
24 A. I'm not alleging that.
25 Q. Are you ruling out the name-calling and

Page 108

1 abusive language as a cause of D███'s behavior
2 changes?
3 A. No.
4 Q. You're saying you don't know what effect,
5 if any, the name-calling and abusive language had on
6 D███'s behavior; right?
7 A. That's correct. I would -- yes, that's
8 correct.
9 Q. Is it your opinion that it's impossible
10 to determine the effect, if any, of name-calling and
11 abusive language on D███?
12 A. I think it is.
13 Q. Why?
14 A. There's just so many other factors
15 involved, not only with his expressive and receptive
16 vocabulary, but all the other factors that we have
17 talked about and I'm sure we're going to talk about.
18 It's just another factor that we're not able to
19 isolate with him.
20       I mean obviously with this particular
21 variable, there's an additional variable of his
22 language impairment. And, you know, it's unfortunate.
23 And this is part of -- you know, this was mentioned in
24 some of the research that Dr. Mueller pointed to.
25 There is even -- and I know this may seem unsavory,

Case 1:20-cv-04666-VMC    Document 108-2    Filed 01/17/23    Page 20 of 26

D.D.T. v.                                                    C. Baker Wright, Ph.D.
Rockdale County School District, et al.                      November 15, 2022

Page 109

1  but the research points out that in some cases ASD may
2  be I think the word that was used was protective in
3  that due to the social communication disabilities
4  under the autism spectrum, understanding all of the
5  nonverbal, social parts of vocal communication, verbal
6  communication, we're not able to know how he's
7  receiving those words.
8      That is one of the challenges in really
9  further researching and knowing the true effects of
10 this type of alleged interaction with him.  And I
11 think that was something that was fairly clear in two,
12 if not all three, of those articles that Dr. Mueller
13 referred to.
14 Q.  You don't have an opinion as to when the
15 name-calling and abusive language had any type of
16 effect on --
17 A.  I don't have an opinion on it, no.
18 Q.  -- on D▮▮▮▮; right?
19 A.  I don't.
20 Q.  And that's because of his level of ASD?
21 A.  I think it's his level of ASD as well as
22 all the other contributing possible factors.
23 Q.  The alleged name-calling and abusive
24 language could have caused or contributed to his
25 behavioral changes; right?

Page 110

1  A.  Possibly.
2  Q.  And it might have had no effect at all;
3  right?
4  A.  It may have had no effect at all.
5  Q.  Okay, if you go to opinion number 7, I
6  think 7 and 8 are really sort of your rebuttals or
7  criticisms of Dr. Mueller's report; is that accurate?
8  A.  That's accurate.
9  Q.  And are the opinions that you identify in
10 7 and 8 complete?
11 A.  I believe so.
12 Q.  All right.  In opinion number 7, you are
13 stating essentially that Dr. Mueller's opinions fail
14 to take into account factors other than abuse; right?
15 A.  That's correct.
16 Q.  You state that Dr. Mueller, quote,
17 detailed important procedures that need to be taken to
18 formulate an opinion about behavioral function and
19 noted that there was no evidence any of these steps
20 were taken, yet he made a statement about behavioral
21 function. Can you explain what you mean by that?
22 A.  He described the process of determining
23 behavioral function and that it's very important to
24 have data collected on the behaviors, the results of
25 those behaviors to be able to make a statement

Page 111

1  relative to what the maintaining variable of that
2  behavior is.  And it was pretty detailed in his review
3  of what's necessary when we conduct functional
4  behavior assessments and, you know, the fairly
5  rigorous procedures that we take to determine
6  function.
7      And he also included in his report
8  that -- he made an opinion about the behavioral -- the
9  likely behavioral function of a particular behavior.
10 And so that was the contrast that I was drawing there
11 is that, you know, he was saying that there wasn't
12 sufficient information or wasn't sufficient procedures
13 done to determine function, but then he kind of
14 determined function, or at least suggested it.
15 Q.  What was the suggested function?
16 A.  Access to tangible.
17 Q.  Tell me what your criticism is.  What did
18 he say and what is your criticism of it?
19 A.  He said -- it was a statement -- I don't
20 have it here with me, but there were statements where
21 he was saying that I think that on one of the IEPs
22 that it was written that the behaviors served an
23 attention or escape function.  And he disagreed with
24 that and said that it didn't -- basically it didn't
25 jive with the other information, that it would be much

Page 112

1  more logical to suggest that the behavior was
2  reinforced by access to tangible.  And that was
3  related to food-seeking behavior.
4  Q.  Is that the criticism in number 7, that
5  he identified procedural steps that needed to be taken
6  and he didn't take that before making that conclusion
7  regarding the access to tangible?
8  A.  Yes, I mean I think the language could
9  have been a little less.  I think it -- I get the
10 point that he's making, that there's some logical
11 connecting of the dots.  But I think the strength in
12 which he stated that it wasn't attention and it wasn't
13 escape, that it was more like -- you know, that it was
14 more likely access to tangible, we really don't have
15 data to support that, so that's what my comments were
16 based on.
17 Q.  And do you believe that's one of his
18 expert opinions in the case?
19 A.  It's in his report.
20 Q.  Okay.  But in terms of number 7, that's
21 all you're criticizing, that small piece?
22      MR. DANIEL:  Object to form.
23      BY MR. FRIED:
24 Q.  Is there anything else that you're
25 criticizing about his report other than his opinion

Case 1:20-cv-04666-VMC    Document 108-2    Filed 01/17/23    Page 21 of 26

D.D.T. v.                                                C. Baker Wright, Ph.D.
Rockdale County School District, et al.                      November 15, 2022

Page 113

1  that it wasn't attention or escape?
2  A.  No.  The second sentence in paragraph 7
3  was further analysis into other information relative
4  to D█████'s behavioral and medical history was
5  seemingly not conducted to explore other possible
6  factors leading to behavior change.
7  Q.  Okay.
8  A.  That's the gist of number 7.  I think the
9  statement about behavioral function alone is only a
10  tiny part of that.  It's really the lack of analysis
11  into the other information is my point for number 7.
12  Q.  Yeah, and I think I said that first.  And
13  forgive me if I confused it.  I asked first if you're
14  basically stating that Dr. Mueller's opinions failed
15  to take into account factors other than abuse, all the
16  factors that we've been discussing.  That's one part
17  of it; right?
18  A.  Yes, yes.
19  Q.  And then there's a subpart of it in
20  relation to his report that certain behavior wasn't
21  attention or escape?
22  A.  I think it's an example of the previous
23  statement, yes.
24  Q.  Is it your opinion that Dr. Mueller had
25  no information or data upon which to conclude that

Page 114

1  D█████'s behavior changes were the result of abuse?
2  A.  I don't know what information he had
3  other than what was listed in his report.
4  Q.  Okay.  Are you saying that the
5  information that was listed in his report provided
6  insufficient data upon which to conclude that D█████'s
7  behavior changes were the result of abuse?
8  A.  Well, he mentions in his documents that
9  he used, he documents D.D.T.'s medical records from
10  Children's Healthcare, D.D.T.'s medical records from
11  GI Care for Kids, D.D.T.'s medical records from
12  Sunrise Pediatric Neurology, but he didn't include any
13  of that information in his report as likely or
14  possible contributing factors.
15  Q.  If he testified that he looked at all the
16  same information that you did, would your opinion
17  change?
18      MR. DANIEL: Object to form.
19  A.  Can you restate that?
20      BY MR. FRIED:
21  Q.  Would your opinion in number 7 change if
22  you understood that Dr. Mueller looked at and reviewed
23  all of the same information you did?
24      MR. DANIEL: Object to form.
25  A.  I understand that he reviewed the same --

Page 115

1  some of the same records that I did, and so my opinion
2  remains.
3      BY MR. FRIED:
4  Q.  So you're saying that the information
5  that you both reviewed did not contain sufficient data
6  for him to be able to conclude that the behavior
7  changes were the result of the abuse?
8  A.  What I'm saying is that I found in the
9  same records that he looked at relative to his medical
10  records, I found information that is important in
11  assessing D█████'s behavior and Dr. Mueller did not
12  refer to any of it.
13  Q.  And if he did and ruled it out, would
14  your opinions change?
15      MR. DANIEL: Object to form;
16  mischaracterizes the evidence.
17  A.  No.
18      BY MR. FRIED:
19  Q.  Why not?
20      MR. DANIEL: Same objection.
21  A.  Why would my opinion not change?
22      BY MR. FRIED:
23  Q.  Yeah, because you're saying that he
24  failed to review the information or failed to evaluate
25  the information or rule it out.  And I'm asking you

Page 116

1  that if he testified that he reviewed the information,
2  analyzed it, and ruled it out, all of those factors as
3  contributing causes, and concluded that the abuse was
4  the cause, would your opinion change?
5      MR. DANIEL: Object to form;
6  mischaracterizes evidence, presents a false
7  hypothetical.
8  A.  I'm not saying that he didn't review.  I
9  trust that he reviewed some of the medical records
10  that are on his report.  So I'm not questioning
11  whether or not he reviewed them because he said he
12  did.  My opinion is that I did review them and I think
13  that it is necessary to include these physiological,
14  psychiatric, medical, and other environmental factors
15  in an assessment of D█████'s behavior.
16      And Dr. Mueller didn't, and he didn't --
17  he said as a part of his listing of documents and
18  information used for generating the opinions, he
19  documented that he reviewed them, but it doesn't say
20  that he ruled them out in his report.  And even if he
21  did, I don't believe that my opinion would change.  My
22  opinion is that these are possible contributing
23  factors to D█████'s behavior.
24      BY MR. FRIED:
25  Q.  Okay.  Your opinion is that all of these

Page 117

1  **factors could possibly have contributed to his**
2  **behavior; right?**
3  A.  Could have possibly, and certainly the
4  combination of several of them could also be a factor.
5  **Q.  Okay.**
6  A.  Kind of like the example I gave earlier,
7  you know, the shift into that middle school, new
8  faces, new places, that also included the peer that he
9  had had problems with in the past, that also included
10 some other medical things that were happening at the
11 time, the noise level in that particular classroom
12 that was generated either by that peer or by other
13 peers in that classroom, given the characteristics of
14 that classroom.
15    There's so many variables involved in
16 that which could or could not include the alleged
17 abuse.  But as I mentioned earlier in our
18 conversation, even if the alleged abuse occurred, that
19 doesn't render these out as nonsignificant.
20 **Q.  Are you assuming that Dr. Mueller did not**
21 **consider any of these additional factors because it**
22 **wasn't discussed in his report?**
23 A.  I'm taking that he listed them as things
24 that he reviewed, and he didn't comment on them.  And
25 I think that the combination of several of these

Page 118

1  things that were going on is very relevant.
2  **Q.  And what I'm asking is are you -- you**
3  **keep saying that he didn't consider these factors.**
4  A.  No, he may have considered it.  I mean he
5  wrote them down as things that he reviewed.
6  **Q.  When you say wrote them down, you're**
7  **talking about what, the materials, or are you talking**
8  **about these factors?**
9  A.  I'm talking about the documents and
10 information used for generating these opinions.  It's
11 a list of documents that he put on his report.
12 **Q.  What I'm asking is you spoke about --**
13 **you're speaking about throughout your opinions a**
14 **number of different factors or variables or conditions**
15 **--**
16 A.  Right.
17 **Q.  -- that possibly could have contributed**
18 **to the behavior changes.  And it sounds to me like you**
19 **one of your opinions in number 7 is criticizing**
20 **Dr. Mueller for not considering those factors.  Do you**
21 **know if he considered those other factors or not in**
22 **coming to his opinion?**
23    **MR. DANIEL:** Object to form.
24 A.  He said documents and information used
25 for generating these opinions.

Page 119

1    **BY MR. FRIED:**
2  **Q.  So you're assuming that he did consider**
3  **all of the factors that we're discussing today?**
4    **MR. DANIEL:** Object to form.
5  A.  I am, I mean yeah.
6    **BY MR. FRIED:**
7  **Q.  Okay.  And are you also assuming that he**
8  **failed to rule out those factors in coming to his**
9  **opinions?**
10   **MR. DANIEL:** Object to form.
11 A.  He doesn't mention them at all.
12   **BY MR. FRIED:**
13 **Q.  That's what I'm getting at.  You're**
14 **assuming that he failed to rule out these other**
15 **factors because his report doesn't discuss them; is**
16 **that accurate?**
17   **MR. DANIEL:** Object to form.
18 A.  He reviewed the materials and didn't feel
19 like they were important enough to include in his
20 report about D████'s behavior.
21   **BY MR. FRIED:**
22 **Q.  Well, you don't know what he thought**
23 **about them, whether they were important or not**
24 **important, do you?**
25   **MR. DANIEL:** Object to form.

Page 120

1  A.  I don't, I mean he didn't put it in his
2  report.
3    **BY MR. FRIED:**
4  **Q.  So is that why you're assuming that he**
5  **felt that they were unimportant?**
6    **MR. DANIEL:** Object to form.
7  A.  I don't know what he felt.  I know that
8  he reviewed them as a part of that list and he didn't
9  otherwise talk about it.
10   **BY MR. FRIED:**
11 **Q.  Do you know if he ruled out those factors**
12 **as potential causes or contributing causes of the**
13 **behavior changes?**
14   **MR. DANIEL:** Object to form; asked and
15 answered.
16 A.  By not putting them in his report, I
17 assume that he ruled -- I assume he ruled them out.
18   **BY MR. FRIED:**
19 **Q.  Okay.**
20 A.  I mean I don't know whether he ruled them
21 out or in.  I mean he reviewed them, based on his
22 report.  I think he's pretty clear in his
23 introduction, you know, first couple of pages of, you
24 know, all of the things that we have to consider as
25 behavior analysts as likely contributing factors to

D.D.T. v.
Rockdale County School District, et al.

C. Baker Wright, Ph.D.
November 15, 2022

Page 121

1 behavior, including environmental and physical
2 variables. He had the same reports that I did and
3 didn't talk about it.
4 **BY MR. FRIED:**
5 **Q. If you take a look at page 9 under your**
6 **section 7, review of Dr. Mueller's report, I just want**
7 **to understand terminology you use. You say, you know,**
8 **unfortunately, throughout his report, he did not**
9 **review or analyze. We've been talking about this,**
10 **medical and physical factors which were valuable parts**
11 **of the, quote, proper context of D.D.T.'s behavior.**
12 **I think I understand what you mean by**
13 **proper context because of what we've been sharing**
14 **today, but can you just explain what you mean by the**
15 **term proper context?**
16 A. I believe that that may be a direct quote
17 from his report. I'm not 100 percent certain. But I
18 think that that's why I put that there in quotes.
19 And, you know, truly, if there were two words in this
20 report that describe what my review is, it's proper
21 context.
22 And proper context, as also reported by
23 Dr. Mueller in his report, it's incredibly important
24 in determining what's a contributing factor to a
25 behavior because to treat a behavior appropriately and

Page 122

1 effectively, we need to have as much information about
2 those contextual variables as possible, which is what
3 I've done in this report is to try to explore as many
4 of those as possible so that if I were taking this
5 next step as a clinician, I would want to follow up on
6 those things because even if I knew function of
7 behavior in the context of a larger more significant
8 medical or physiological problem, you know, it would
9 be inappropriate to move forward without that
10 information.
11 So that's really what I'm referring to
12 about his report is that he notes in the beginning
13 section of his report about how much we need to know
14 really and the data that we need to be able to suggest
15 what actually is going on with a particular behavior.
16 And the items that we've talked about today that I
17 reviewed in my report, I believe that that's part of
18 proper context.
19 **Q. Okay. You're talking about the**
20 **environmental, medical, and physical factors or**
21 **variables that we've already discussed; right?**
22 A. That's correct. Those are part of proper
23 context.
24 **Q. But let me just confirm. And Dr. Mueller**
25 **was also provided, you know, additional records, you**

Page 123

1 **know, for his report before he was deposed. He was**
2 **asked the same question, were you provided additional**
3 **records.**
4 A. Okay.
5 **Q. And I think you said yeah, you would**
6 **agree or you wouldn't dispute that Dr. Mueller**
7 **reviewed all of the same records you did; right?**
8 A. Well, I mean he -- I'm assuming he
9 reviewed what he wrote in his report that he reviewed.
10 **Q. Do you dispute that he reviewed the same**
11 **medical records that you did?**
12 A. I only know what he wrote in his report.
13 **Q. Yeah, what I'm getting at is that he was**
14 **provided -- I'm representing to you that he was**
15 **provided any additional medical records, any**
16 **additional IEPs or documents. And what I'm asking**
17 **you -- so I'm flipping it -- do you dispute that**
18 **Dr. Mueller reviewed all the same medical records you**
19 **did?**
20 A. Can you restate that? I'm having
21 problems -- I think I know where you're going, but I
22 want to be sure.
23 **Q. Do you dispute that Dr. Mueller reviewed**
24 **the same medical records you did in preparing his**
25 **report?**

Page 124

1 A. I'm sorry, I'm trying to be --
2 **Q. Do you have any reason to dispute the**
3 **allegation or the representation that Dr. Mueller**
4 **reviewed the same medical records you reviewed in**
5 **preparation for his report?**
6 A. Can I rephrase that to make sure I
7 understand correctly?
8 **Q. Yeah.**
9 A. Okay. Are you saying do I think he
10 misrepresented what he actually reviewed?
11 **Q. No, I'm just saying -- what I'm**
12 **representing to you is that there are certain medical**
13 **records that he was provided and reviewed after his**
14 **report but before his deposition.**
15 A. Okay.
16 **Q. I'm going to ask the same question, you**
17 **know, you reviewed this stuff, do you change any of**
18 **your opinions, you know, no. And so really all I'm**
19 **asking you to confirm is that he reviewed the same**
20 **medical records you did.**
21 **MR. DANIEL:** Object to form.
22 **BY MR. FRIED:**
23 **Q. Does that make sense?**
24 **MR. DANIEL:** Object to form. There is no
25 way he can possibly confirm what Dr. Mueller --

**D.D.T. v.**
**Rockdale County School District, et al.**

C. Baker Wright, Ph.D.
November 15, 2022

---

Page 125

1    BY MR. FRIED:
2    Q.   You don't have any facts to dispute, or
3    any reason to dispute that Dr. Mueller reviewed the
4    same medical records you do; correct?
5    A.   I don't know what he did or what he
6    didn't review, that's impossible for me to know.
7    Q.   Do you have any reason to dispute the
8    fact that Dr. Mueller reviewed the same medical
9    records you did?
10   A.   No.
11   Q.   Do you have any reason to dispute that
12   Dr. Mueller reviewed the same psychological records
13   you did?
14   A.   I don't have any reason currently to know
15   what he reviewed or didn't.
16   Q.   Do you have any reason to dispute that he
17   reviewed the same school records and assessments as
18   you did?
19   A.   I don't have any reason to believe that.
20   Q.   Do you have any reason to dispute that
21   Dr. Mueller reviewed the same IEPs and the same 2016
22   BIP that you did?
23   A.   Again, I'm trying not to be difficult,
24   but I don't know what he reviewed and what he didn't.
25   The only evidence I have is his report.  It's hard for

---

Page 126

1    me to say whether or not I dispute something that I
2    don't really have any evidence of.  I mean I would
3    hope that he would do that, and I know that those
4    records are common to this case, but, you know, in
5    terms of going through a list of questions on whether
6    or not I think he reviewed something, I don't --
7    that's my hesitation.
8    Q.   Understood.  Yep.  Look, welcome to
9    lawyers.  You told me in the beginning that this was
10   the first time that you've been deposed in a case.
11   A.   Yeah.
12   Q.   These questions are strange and they're
13   not normal, and I understand your confusion.
14   A.   Yeah.  My business is --
15   Q.   But for my purposes and for what I'm
16   trying to get done here, you can say you don't know,
17   you can say you have no reason to dispute, you can say
18   I dispute it.  It doesn't matter to me, I'm just, you
19   know, I'm completing my record.
20   A.   I don't know.  My business is one of
21   evidence, and so I'm --
22   Q.   You don't have any reason to dispute that
23   he reviewed the same Complaint and allegations that
24   you did; right?
25   A.   I don't know what he reviewed.

---

Page 127

1    Q.   You don't have any reason to dispute that
2    he reviewed the same deposition testimony of K█ W█;
3    right?
4    A.   I don't know what he reviewed.
5    Q.   Do you believe that the documents that
6    are identified in his report are somehow
7    misrepresented with regard to documents you reviewed?
8    A.   No, I trust that if he listed them in his
9    report, that he reviewed them.
10   Q.   The deposition testimony of D█'s
11   mother and father, you reviewed that; right?
12   A.   Yes.
13   Q.   Do you have any reason to dispute that
14   Dr. Mueller reviewed both of those depositions?
15   A.   He has listed deposition transcript of SC
16   with exhibits on his report, so I assume that that was
17   part of his review.
18   Q.   Okay.  When we talk about data in your
19   world, is the information that's contained in the
20   medical records, the psyche records, the school
21   records, the IEPs, is that data that goes into helping
22   you form an opinion?
23   A.   It's information, yes.
24   Q.   Okay, do you use data and information in
25   a different manner?

---

Page 128

1    A.   I do.
2    Q.   Tell me the difference.
3    A.   My difference is data is typically some
4    numeric measure.
5    Q.   Is it your opinion that Dr. Mueller did
6    not have sufficient information upon which to conclude
7    that D█'s behavior changes were the result of
8    abuse?
9    A.   Again, I don't know what information he
10   had and what he didn't other than what he wrote in his
11   report.
12   Q.   Is it your opinion that he did not have
13   sufficient information upon which to conclude that
14   D█'s behavior changes were the result of abuse?  I
15   guess I'm asking do you have an opinion one way or the
16   other?
17   A.   Yeah, I mean relative to his medical
18   records, given that he said that he reviewed medical
19   records as a part of his report, I think he had the
20   same pieces of evidence that I had, and I drew
21   different conclusions than he did.
22   Q.   Okay.  I'm looking at page 5, opinion
23   number 8.  I really don't have many questions on this.
24   You're basically stating that not having a proper BIP
25   or FBA or training is not a direct path to abuse in

---

**D.D.T. v.**
**Rockdale County School District, et al.**

C. Baker Wright, Ph.D.
November 15, 2022

Page 129

1  your opinion; correct?
2  A.  Yes, that's a stretch of a comment to
3  make.  And I think his -- you know, I think he made it
4  made a stronger statement with using the words
5  foreseeable and predictable.  That's a very strong
6  statement.
7  Q.  Can you elaborate?
8  A.  I don't believe it's appropriate to say
9  or accurate to say that abuse is a foreseeable and
10  predictable result of the failure to appropriately
11  develop and implement a behavior plan.
12  Q.  Why is that not appropriate or accurate?
13  A.  Because there are a lot of behavior plans
14  out there that aren't implemented to 100 percent.  And
15  there are a lot of behavior plans that aren't to the
16  level that Dr. Mueller and I would note as being
17  sufficient.  There are a lot of people who are not
18  trained to the level that Dr. Mueller and I would
19  like.  But to say that an insufficient BIP essentially
20  causes abuse and is a foreseeable and predictable
21  result, that's a pretty big jump to say that an
22  insufficient BIP causes and makes abuse predictable.
23  In my 20-plus years of being in schools, that is not
24  accurate.
25  Q.  Have you ever assessed, evaluated, or

Page 130

1  been involved in a situation where a child in a
2  classroom was being abused and you assessed that the
3  BIPs and FBAs were inadequate and the training was
4  inadequate?
5  A.  My job as the behavior analyst is to come
6  into places where people by the nature of me being
7  involved are not fully trained and in a lot of
8  different cases don't have sufficient or appropriate
9  BIPs.  That's why they bring people like Dr. Mueller
10  and I into classrooms.  So that happens all the time.
11  That is part of what -- you know, it's a
12  large part of what I do.  It's what I love to do.
13  Like I mentioned to you at the very beginning, the
14  vast majority of my clinical work is working in
15  schools and classrooms and working with teachers.
16  None of them -- and this is not a
17  judgment.  None of them have, you know, a lot of
18  behavior analysis training.  That's what we're there
19  for, and to help them improve their behavior plans
20  that may be insufficient, to improve the level of
21  specificity that their FBAs may not have reached.
22  And I don't believe that I can honestly
23  say that of all of the cases, all of the classrooms,
24  all of the teachers that I've been with, that I felt
25  that the insufficient BIP resulted in abuse.

Page 131

1  Q.  What I'm asking, and I think you might be
2  responding, but have you been in a classroom where
3  you're assessing or looking at the abuse and it has
4  been revealed that there were improper BIPs, FBAs, or
5  training?
6  MR. DANIEL: Object to form.
7  A.  Yes.
8  BY MR. FRIED:
9  Q.  Yes?
10  MR. DANIEL: Object to form.
11  A.  I've been in a classroom where that had
12  been alleged.
13  BY MR. FRIED:
14  Q.  Explain what you mean, where that has
15  been alleged.  Is this one incident?
16  A.  This is an incident.
17  Q.  Okay.  And so what was alleged?
18  A.  Well, it was alleged that the teacher was
19  acting inappropriately with the students.
20  Q.  And what did you find, that there were
21  inappropriate BIPs or FBAs or insufficient training?
22  A.  I don't think that they were tied
23  together.  I think there were a lot of issues in the
24  classroom.
25  Q.  Did you consider that as a factor?

Page 132

1  A.  Sure.
2  Q.  And what did you conclude, did you
3  conclude that the improper BIPs, improper training had
4  nothing to do with the abuse that was alleged?
5  MR. DANIEL: Objection.
6  A.  That wasn't my role there.  My role was
7  to consult with the classroom to make it better, and
8  that's what we did.
9  BY MR. FRIED:
10  Q.  Do you have an opinion one way or the
11  other as to whether a failure to have proper BIPs,
12  FBAs, or training could be a contributing factor that
13  results in abuse?
14  A.  Are you asking is it my opinion that that
15  is one of the factors, that it could be a possible
16  factor here?
17  BY MR. FRIED:
18  Q.  Yeah.
19  A.  Sure, I mean it's part of the
20  environment.
21  Q.  Okay.  Is it your opinion that D     did
22  not experience any of the acts alleged as traumatic?
23  A.  That's not my opinion.
24  Q.  Do you have any opinions --
25  A.  I'm not making that opinion.

D.D.T. v.
Rockdale County School District, et al.

C. Baker Wright, Ph.D.
November 15, 2022

Page 133

1 Q. Understood, yeah. Do you have any
2 opinions as to whether D███ experienced these acts
3 as traumatic or not?
4 A. I can't make that opinion.
5 Q. In your experience have you ever worked
6 with a child with ASD who has been the victim of
7 repeated abuse by his or her teachers?
8     MR. DANIEL: Object to form.
9 A. I have been involved in the situation I
10 was just telling you about where a teacher was moved
11 out of the classroom because of several factors. I
12 don't remember what the results of the DFACS
13 investigation was. But again, my role there was to
14 make it better for the students and the teachers, and
15 that's what I did.
16     BY MR. FRIED:
17 Q. Is that the only time?
18 A. I think that's the only time where it
19 was -- I mean there have -- yeah, that's -- I think
20 that's the only time that I've been directly involved.
21 There have been other times in my career where, you
22 know, as a mandatory reporter I've either been
23 involved or, you know, on our team know the situation
24 is happening.
25 Q. Have you ever evaluated a student like

Page 134

1 D███ who was experiencing the behavior changes that
2 we've been talking about and linked it to abuse or
3 allegations of abuse?
4     MR. DANIEL: Object to form.
5 A. Any time I'm brought in on a case I do
6 exactly what I've done with D███, which is to look
7 at all the contributing factors involved in any
8 behavior change. If there have been, and I believe
9 that there have been, cases where there was abuse
10 either at home, in the community, or at school, which
11 has been a limited amount, I've concluded that that
12 could potentially be a possible factor. So I can't
13 ever rule it out. But it's part of the puzzle.
14     BY MR. FRIED:
15 Q. Have you ever provided an opinion -- and
16 I don't mean expert or legal -- provided an opinion in
17 a situation that said okay, these behavioral changes
18 are linked to abuse?
19     MR. DANIEL: Object to form.
20 A. I think there are situations where I said
21 these are -- that we have to consider, we have to
22 consider the effect of those events.
23     BY MR. FRIED:
24 Q. How many situations have you been in like
25 that, countless?

Page 135

1 A. I don't know.
2 Q. Over a hundred?
3 A. I don't know.
4 Q. Less than ten?
5 A. More than ten.
6 Q. More than 20?
7 A. No, probably not. I don't -- I have no
8 idea. We're talking about a 20-year career here.
9 Putting numbers to it is difficult.
10     MR. FRIED: All right, guys, I think that
11 I am finished. But give me ten minutes.
12     Jeffrey, are you planning on asking your
13 expert any questions?
14     MR. DANIEL: I haven't decided yet.
15     MR. FRIED: Okay. All right, well, then
16 give me ten minutes, and we might be done, we
17 might not.
18     MR. DANIEL: Okay.
19     (Recess.)
20     BY MR. FRIED:
21 Q. Dr. Wright, can you just read into the
22 record the name of the book that you contributed to?
23 A. Pediatric Health Conditions in Schools,
24 edited by Allison G. Dempsey. And I contributed to
25 Chapter 11, Behavioral Strategies to Promote

Page 136

1 Adherence.
2 Q. To Promote Adherence?
3 A. Adherence.
4 Q. And can you just tell me the date that
5 book was published?
6 A. That was published by Oxford University
7 Press in 2020.
8 Q. All right, thank you for that. Pending
9 any questions from your counsel, I don't have any
10 further questions.
11     MR. DANIEL: I don't have anything.
12     MR. FRIED: Thank you, everybody. I'm
13 assuming your witness will read and sign?
14     MR. DANIEL: Yes.
15     MR. FRIED: All right, thanks everybody.
16 Thanks, Lynn. We will take an electronic
17 version.
18     MR. DANIEL: Yeah, searchable electronic
19 is good for us also.
20     (Reading and signing of the transcript by
21 the witness was reserved.)
22     (Deposition concluded - 1:46 p.m.)
23
24
25